# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2018

(Argued: May 31, 2019      Decided:  September 12, 2019
Amended: December 16, 2019)

Docket No. 18-1503-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

MARK JOHNSON,

*Defendant-Appellant.*[*]

_____

Before:

CALABRESI and LOHIER, *Circuit Judges*, and DONNELLY, *District Judge*.[**]

Mark Johnson, the former global head of the foreign exchange trading desk at the investment bank HSBC, was convicted by a jury of wire fraud and conspiracy to commit wire fraud in connection with a foreign currency exchange transaction with Cairn Energy.  At trial, the Government argued, among other things, that Johnson denied Cairn the right to control its assets by depriving it of

---

[*] The Clerk of Court is directed to amend the official caption to conform with the above.

[**] Judge Ann M. Donnelly, of the United States District Court for the Eastern District of New York, sitting by designation.

1   information necessary to make its own discretionary economic decisions.
2   Johnson argues that there was insufficient evidence for a reasonable jury to
3   convict him under a right-to-control theory because Cairn received the benefit of
4   its bargain in the transaction and any misrepresentations Johnson may have
5   made were immaterial.  We conclude that there was sufficient evidence to
6   convict Johnson on the right-to-control theory because a reasonable jury could
7   conclude that his misrepresentations to Cairn related to the price of the
8   transaction and were capable of influencing Cairn's decisionmaking.
9   **AFFIRMED.**
10
11                           LAUREN HOWARD ELBERT, Assistant United States
12                           Attorney (David C. James, Assistant United States
13                           Attorney, Carol Sipperly, Brian Young, Assistant Chiefs,
14                           Blake Goebel, Trial Attorney, United States Department
15                           of Justice, *on the brief*), *for* Richard P. Donoghue, United
16                           States Attorney, Eastern District of New York,
17                           Brooklyn, NY, *for Appellee* United States of America.
18
19                           ALEXANDRA A.E. SHAPIRO, Shapiro Arato LLP, New
20                           York, NY (Eric S. Olney, Jacob S. Wolfe, Shapiro Arato
21                           LLP, New York, NY, Frank H. Wohl, John R. Wing,
22                           Lankler Siffert & Wohl LLP, New York, NY, *on the brief*),
23                           *for Defendant-Appellant* Mark Johnson.

24   LOHIER, *Circuit Judge*:

25          Mark Johnson, the former global head of the foreign exchange trading

26   desk at the investment bank HSBC, was convicted by a jury of wire fraud and

27   conspiracy to commit wire fraud in connection with a foreign currency exchange

28   transaction with Cairn Energy.  At trial and on appeal, the Government argued

29   that Johnson could be convicted on either of two theories of criminal liability:

30   (1) misappropriation of the confidential information of Cairn in breach of a duty

                                         2

of trust and confidence owed to Cairn; or (2) denial of Cairn's right to control its

assets by depriving it of information necessary to make discretionary economic

decisions.  In response, Johnson argues that there was insufficient evidence for a

jury to convict him under the misappropriation theory and also insufficient

evidence to convict him under a right-to-control theory because Cairn received

the benefit of its bargain and any misrepresentations that Johnson may have

made were immaterial.  We conclude that there was sufficient evidence to

convict Johnson on the right-to-control theory because a reasonable jury could

conclude that his misrepresentations to Cairn related to the price of the

transaction, which was an essential element of the parties' bargain, and were

capable of influencing Cairn's decisionmaking.  Accordingly, we need not reach

Johnson's arguments as to the misappropriation theory, and Johnson's conviction

is **AFFIRMED.**

## BACKGROUND

1.  <u>Facts</u>

Because this is an appeal from a judgment of conviction entered after a

jury trial and Johnson challenges the sufficiency of the evidence against him, the

following facts are drawn from the trial evidence and described "in the light

1    most favorable to the Government." United States v. Caltabiano, 871 F.3d 210,

2    213 (2d Cir. 2017).

3        A. Cairn Energy Selects HSBC to Perform a Large FX Transaction

4        Cairn, whose stock trades on the London Stock exchange, is one of

5    Europe's leading oil and gas firms.  In August 2010 Cairn announced a plan to

6    sell a majority interest in one of its subsidiaries and to distribute a substantial

7    amount of the sales proceeds to its shareholders.  Before Cairn could distribute

8    the proceeds, however, it had to first convert the U.S. dollars (USD) it received

9    from the sale into British pounds (GBP).  Cairn retained Rothschild & Co., an

10   investment bank, to advise it on conducting a significant foreign currency

11   exchange transaction of up to four billion dollars for pounds (the FX

12   Transaction).  Such a transaction involves trading one currency for another at the

13   exchange rate for the underlying currencies, whose values are governed by the

14   laws of supply and demand.  Movements in exchange rates are measured in

15   "pips," and 100 pips is equivalent to one penny.

16       In 2011 Cairn sent Requests for Proposals (RFPs) to nine major banks to

17   execute the FX Transaction.  HSBC responded to the RFP by recommending that

18   Cairn employ a method of currency exchange known as a Fixing Transaction.

1    HSBC explained that a Fixing Transaction involved exchanging GBP for USD at

2    either a daily exchange rate that the European Central Bank published, or at an

3    hourly exchange rate that the company WM/Reuters published.  The parties

4    eventually agreed to use the hourly exchange rate published by WM/Reuters.[1]

5    To effectuate the transaction and to give HSBC time to buy the pounds to sell to

6    Cairn, HSBC requested that Cairn provide HSBC two hours' advance notice of

7    the hourly exchange rate, or fix, at which Cairn wanted to trade.  HSBC warned

8    that a Fixing Transaction involved some risk because Cairn would be exposed to

9    exchange rate fluctuations in the hours prior to the fix.  But HSBC also reassured

10   Cairn that it could "seamlessly execute a transaction of this magnitude without

11   creating excessive market volatility."  App'x 274.  HSBC further explained that a

12   Fixing Transaction provided transparency to Cairn's shareholders, who would

13   be able to see that Cairn paid no more than the published market rate.

14        About a week after HSBC's response to Cairn's RFP, Francois Jarrosson,

15   the Rothschild partner principally responsible for the Cairn engagement, spoke

16   with Johnson about a Fixing Transaction.  Johnson explained that having at least

---

[1] WM/Reuters calculated its hourly exchange rate by taking the "median average" of the price of trades published in a one-minute window, beginning 30 seconds before and finishing 30 seconds after the hour.  App'x 279.

two hours' notice before the designated fix would allow HSBC to "more

quietly . . . accumulate" pounds for Cairn.  App'x 386.  But if Cairn gave HSBC

only thirty minutes' notice, Johnson warned, HSBC would have "a lot to buy"

and would "cause a lot of noise" in the market.  App'x 387.  Johnson also said

that HSBC would aim "to make a small amount of money out of [the Fixing

Transaction] clearly because that's . . . our business," but that HSBC also wanted

"a happy customer" who would get "a fair price."  App'x 387.  Jarrosson worried

that HSBC might make more than "a small amount of money" if it was able to

purchase pounds at an exchange rate much lower than the hourly fix that Cairn

would eventually be obligated to pay.  In that case, Jarrosson asked, would

HSBC be open to sharing "some [of the] upside" with Cairn?  App'x 389.

Johnson demurred, and answered that a bank that offered a discount on the fix

rate really intended to trade currency before the fix in such a way as to artificially

increase, or "ramp," the currency's price at the fix.  After ramping the fix,

Johnson added, such a bank would sell the currency to its counterparty at the

inflated fix, making up for any loss on the negotiated discount.  Johnson said that

he was "horrified" when he saw banks offering "the fix minus one pip" (in other

words, the exchange rate at the fix minus one hundredth of a cent), because those

1  banks clearly intended to "ramp the fix" at the expense of the counterparty.

2  App'x 389–90.

3      Following his call with Johnson, Jarrosson recommended that Cairn

4  engage HSBC and use a Fixing Transaction to complete the currency exchange.

5      B.  <u>The Mandate Letter</u>

6      In late October 2011 Cairn and HSBC signed a "Mandate Letter" that

7  formally awarded Cairn's FX engagement to HSBC.  The Mandate Letter

8  committed HSBC to execute an FX Transaction at Cairn's request for an amount

9  up to $4 billion USD.  The Letter also gave Cairn the option of performing the

10  trade through a Fixing Transaction or a Full-Risk Transfer.  If Cairn chose a

11  Fixing Transaction, HSBC would be obligated to perform the transaction at a

12  price equivalent to a publicly available fix rate, provided that Cairn gave HSBC

13  around two hours' notice prior to the particular hourly fix that Cairn wanted to

14  use.  If Cairn chose a Full-Risk Transfer, HSBC would be obligated to perform the

15  transaction at the prevailing market rate at the time of Cairn's call plus, at most, a

16  100-pip charge.  The additional charge for the Full-Risk Transfer protected HSBC

17  against the currency risk it assumed by first guaranteeing Cairn a particular

18  GBP/USD exchange rate and only thereafter purchasing pounds to sell to Cairn.

1          C.  The FX Transaction

2          On December 7, 2011, Cairn instructed HSBC that it wanted to buy 2.25

3    billion pounds for dollars using a Fixing Transaction at the day's 3 p.m. fix.

4    HSBC trader Frank Cahill had the job of executing Cairn's order.  Once Johnson

5    learned that the Fixing Transaction would happen that afternoon, however, he

6    began to tip off HSBC traders in New York and London to buy pounds.

7    Meanwhile, Cahill, unaware of the promise not to "ramp up" the price of

8    pounds, executed the Cairn transaction the way he had traded fixing transactions

9    "[a]lmost every day of [his] career."  App'x 150, 172.  To ensure a profit for

10   HSBC, Cahill bought pounds in a manner designed to increase their price, in part

11   by using "aggressive" buying techniques like "bidding through the market"

12   (which means putting in an offer to buy at a higher price than sellers' stated

13   prices).  App'x 154–55.  But a bank's buying spree tends to drive up the price of

14   the commodity that the bank is buying.  Had HSBC wanted to acquire pounds in

15   a way that kept their price "as low as possible," Cahill confirmed, he would have

16   tried to mask HSBC's buying spree by trading less aggressively.  App'x 155.

17         At 2:54 p.m. that day, Johnson called his colleague Stuart Scott, who was

18   with Cahill in London, to discuss what Cahill should do in the last few minutes

1    before the 3 p.m. fix.  Johnson advised Scott that Cahill should not "ramp" the fix

2    above a 1.5730 GBP/USD exchange rate because Cairn "[couldn't] really

3    complain" so long as the 3 p.m. fix stayed below that rate.  App'x 335.  But if the

4    rate rose above 1.5730, Johnson said, Cairn would "squeal."  Id.  Johnson later

5    told a colleague that his team had to "make sure the fix [was] below [1.5730] or

6    [Cairn was] gonna feel [it had] been ripped off."  Gov't App'x 137.[2]  Johnson

7    apparently believed that Cairn would not complain if the fix rate stayed below

8    1.5730 because 1.5730 was 100 pips above 1.5630, the prevailing rate at the time

9    that Cairn placed its order with HSBC.  As Johnson surely knew, had Cairn

10   chosen instead to proceed with a Full-Risk Transfer, Cairn would have bought

11   the 2.25 billion pounds at an exchange rate of 1.5630 plus a 100-pip charge, for

12   precisely the same final rate of 1.5730.  Therefore, Johnson calculated, so long as

---

[2] After publication of the original opinion in this appeal, Johnson moved to "clarify" the appellate record under Rule 10(e)(3) of the Federal Rules of Appellate Procedure because the Government included the wrong version of certain documents introduced at trial, including the transcript quoted here.  The Government, upon which the Court relies significantly to ensure the accuracy of the record in criminal appeals, has acknowledged its error.  Construing Johnson's motion as one to correct the record under Federal Rule of Appellate Procedure 10(e)(2), we grant the motion.  Accordingly, the above quotation reflects the language of the transcript actually introduced and presented to the jury at trial.  We nevertheless conclude that any difference between the correct documents introduced at trial and the versions that the Government erroneously included in its original appendix are not material to our resolution of the issues on appeal.

the final cost of the Fixing Transaction that Cairn requested stayed below what

the cost of a Full-Risk Transfer—even with its extra charge—would have been,

Cairn had nothing to complain about.

        D. <u>Outcomes for Cairn and HSBC</u>

        The published 3 p.m. fix on December 7, 2011 was 1.57185.  In a debriefing

conference call later that day, Cairn's treasurer expressed concern over the

increase in the GBP/USD exchange rate during the hour before 3 p.m.  In

explaining why the market had moved so much during that hour, Johnson's

colleague, Scott, suggested that the Russian Central Bank was responsible.

Johnson then corroborated Scott's statement, saying that the Russian Central

Bank was "always selling dollars."  App'x 340.  Although Johnson added that he

felt "comfortable" with the 3 p.m. rate because Cairn would have ended up with

a higher rate had it chosen a Full-Risk Transfer, App'x 339, he offered to return

2.5 pips to Cairn, for a final exchange rate of 1.57160.  The next day after the

conference call, Johnson appeared to confirm that he knew the Russian Central

Bank story was a lie, recounting to a colleague that when Cairn asked why the fix

rate had jumped, "we said the usual, Russian names, other central banks, all that

sort of stuff."  Gov't App'x 137.

1    HSBC ultimately profited about $7 million on the transaction with Cairn.

2    2.  Procedural History

3    Johnson was indicted on one count of conspiracy to commit wire fraud, see

4    18 U.S.C. § 1349, and ten counts of wire fraud, see 18 U.S.C. § 1343.[3]  At trial, the

5    Government's primary theory of liability under the wire fraud statute was that

6    Johnson misappropriated Cairn's confidential information, in breach of a duty of

7    trust and confidence owed to Cairn, by driving up the fix rate in order to

8    generate secret profits for HSBC (the "misappropriation theory").  The jury was

9    accordingly instructed that in order to convict Johnson under that theory,

10   Johnson and Cairn must have entered into a relationship of "reliance and de

11   facto control and dominance."  Gov't App'x 103.

12   The Government also offered an alternative theory of liability.  Referring

13   to the central bargain between Cairn and HSBC, the Government told the jury

14   that Johnson had denied Cairn the right to control its assets by depriving it of

15   information necessary to allow it to make discretionary economic decisions (the

16   "right-to-control theory").  Further to this theory, the District Court instructed

17   the jury that Johnson must have made "misrepresentations or non-disclosures"

---

[3] Johnson's colleague, Scott, was also indicted but is still in the United Kingdom and has contested extradition.

1    to Cairn that went "to the heart of Cairn's bargain with HSBC" and could or did

2    "result in tangible economic harm to Cairn."  Gov't App'x 105.  It would not be

3    enough to convict Johnson on this theory, the District Court cautioned, if

4    Johnson's misrepresentations merely induced Cairn to enter the bargain with

5    HSBC.

6          The jury convicted Johnson of conspiracy to commit wire fraud and all but

7    one of the wire fraud counts without specifying which theory of liability it relied

8    upon.[4]  The District Court sentenced Johnson principally to twenty-four months

9    of imprisonment.

10         This appeal followed.[5]

11                              DISCUSSION

12         Johnson challenges the sufficiency of the evidence supporting his wire

13   fraud convictions under either theory of liability.  He also claims that applying

---

[4] The Government also dismissed another of the wire fraud counts before trial.
[5] This Court granted Johnson's motion for bail pending appeal.

the federal wire fraud statute, § 1343, to the facts of this case violated his right to

due process.  We address each challenge in turn.

1.  <u>Sufficiency of the Evidence</u>

By raising a sufficiency challenge, Johnson "bears a heavy burden, [for] we

view the evidence in the light most favorable to the government, drawing all

inferences in the government's favor and deferring to the jury's assessments of

the witnesses' credibility."  <u>Caltabiano</u>, 871 F.3d at 218 (quotation marks

omitted).  "We will overturn the jury's verdict only if 'no rational trier of fact

could have found the essential elements of the crime beyond a reasonable

doubt.'"  <u>Id.</u> (quoting <u>United States v. Hussain</u>, 835 F.3d 307, 312 (2d Cir. 2016)).

"[W]hen two theories of an offense are submitted to the jury and the

evidence supports one theory but not the other," the verdict should be affirmed.

<u>United States v. Rutkoske</u>, 506 F.3d 170, 176 (2d Cir. 2007).  Here, we conclude

that the evidence was sufficient to convict Johnson of wire fraud and conspiracy

to commit wire fraud for depriving Cairn of the "right to control" its assets.

Accordingly, we need not and do not consider Johnson's arguments with respect

to the misappropriation theory.

To prove a violation of the federal wire fraud statute, the Government had

to establish that Johnson (1) had an intent to defraud, (2) engaged in a fraudulent

scheme to obtain Cairn's money or property "involving material

misrepresentations—that is, misrepresentations that would naturally tend to

influence, or are capable of influencing," Cairn's decisionmaking, and (3) used

the wires to further that scheme.  <u>Caltabiano</u>, 871 F.3d at 218 (involving the mail

fraud statute); <u>see</u> <u>United States v. Binday</u>, 804 F.3d 558, 569 (2d Cir. 2015);

<u>United States v. McGinn</u>, 787 F.3d 116, 122 (2d Cir. 2015).  "[W]e have recognized

that the property interests protected by the . . . wire fraud[ ] statute[ ] include the

interest of a victim in controlling his or her own assets."  <u>Binday</u>, 804 F.3d at 570

(quotation marks omitted).  In right-to-control cases we determine if sufficient

proof of fraudulent intent exists by considering whether the defendant's

deception "affect[ed] the very nature of the bargain" between the defendant and

the victim.  <u>United States v. Starr</u>, 816 F.2d 94, 98 (2d Cir. 1987); <u>see</u> <u>Binday</u>, 804

F.3d at 569–70, 575 (looking to whether the deception went to "an essential

element of the bargain" to determine whether the defendant "contemplated

harm" cognizable under the statute (quotation marks omitted)).

1          With that background, we consider whether there was sufficient evidence

2     that Johnson intended to deprive Cairn of information "that could impact . . .

3     [Cairn's] economic decisions," United States v. Finazzo, 850 F.3d 94, 108 (2d Cir.

4     2017) (quotation marks omitted), by, for example, influencing Cairn's "economic

5     calculus or the benefits and burdens of the agreement," Binday, 804 F.3d at 570,

6     or preventing Cairn from "negotiat[ing] a better deal for itself," United States v.

7     Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir. 1994).  We remain mindful of the "fine

8     line between schemes that do no more than cause their victims to enter into

9     transactions they would otherwise avoid"—which do not violate the wire fraud

10    statute—and those schemes that "depend for their completion on a

11    misrepresentation of an essential element of the bargain."  United States v.

12    Shellef, 507 F.3d 82, 108 (2d Cir. 2007).

13          A. Intent to Defraud

14          Johnson's principal challenge to the sufficiency of the evidence against him

15    under the right-to-control theory relates to his intent to defraud Cairn.  Pointing

16    out that the Mandate Letter required that HSBC perform the transaction "at

17    Cairn's request, for an amount of up to USD4bn" at a rate "equivalent to [a] . . .

18    publicly available fixing[]," App'x 309, Johnson asserts that HSBC fulfilled its

obligation to Cairn by delivering 2.25 billion pounds to Cairn based on the 3 p.m.

fix rate and that the Mandate Letter, by its plain terms, neither restricted how

HSBC could acquire the pounds nor limited HSBC's profits.  Johnson therefore

claims that Cairn received "the full economic benefit of its bargain" under the

parties' Mandate Letter.  Appellant's Br. 43 (quotation marks omitted).  Relying

in part on our decision in Binday, Johnson urges that he cannot be criminally

liable for wire fraud in the absence of a contractual breach.

We disagree.  Section 1343 applies even if the parties' contract was never

breached.  Indeed, in Binday, we concluded that even though the victim received

the benefit of its bargain under the terms of the parties' contract, there was proof

of fraudulent intent because the defendants' misrepresentations implicated an

essential element of the bargain.  Binday, 804 F.3d at 565–67, 575–76.  The

defendants in Binday were accused of fraudulently misrepresenting their intent

to immediately transfer to third-party investors certain life insurance policies

that they had induced insurers to issue, even though the defendants knew that

the insurers had banned their brokers from authorizing such transfers.  Id. at

565–67.  On appeal, the defendants challenged their mail and wire fraud

convictions by arguing that, regardless of the insurers' ban, the policies

1    themselves permitted the defendants to sell them to third parties.  Id. at 575.  We

2    rejected the argument, finding sufficient evidence of an intent to harm because

3    the defendants' misrepresentations concerned a central part of the bargain:

4    whether the policies would certainly be sold and whether and at what price the

5    insurers would issue them.  Id. at 569–71, 575–76.  As we have explained,

6    fraudulent intent may be "apparent" where "the false representations are

7    directed to the quality, adequacy or price of the goods themselves . . . because the

8    victim is made to bargain without facts obviously essential in deciding whether

9    to enter the bargain."  United States v. Regent Office Supply Co., 421 F.2d 1174,

10   1182 (2d Cir. 1970); see also Starr, 816 F.2d at 98–100.

11        Similarly here, Johnson represented to Cairn that the price of the FX

12   Transaction would be determined under particular conditions.  Most

13   importantly, Johnson assured Cairn, HSBC would purchase pounds "quietly"

14   without ramping the 3 p.m. fix rate.  App'x 387.  Johnson thus suggested that

15   HSBC would seek a profit of just "a few pips for [its] account."  App'x 390.

16   Instead, Johnson directed Cahill, his trader, to ramp the fix rate to just under

17   1.5730, 100 pips above where the GBP/USD rate had started.  Johnson therefore

18   deceived Cairn with respect to both how the FX Transaction would be conducted

and the price of the FX Transaction.  See Binday, 804 F.3d at 571 (noting that

"[t]he requisite harm is also shown where defendants' misrepresentations

pertained to the quality of services bargained for").  For this reason, we conclude

that Johnson's misrepresentations provided sufficient evidence for a reasonable

jury to find beyond a reasonable doubt that he intended to defraud Cairn.

B.  Material Misrepresentations

Johnson next argues that there was insufficient evidence that any of his

misrepresentations were material.  A misrepresentation is material if it is capable

"of influencing the intended victim."  Neder v. United States, 527 U.S. 1, 24

(1999).  The requirement of materiality thus differs from the requirement of

fraudulent intent, which is that the misrepresentation must be "capable of

resulting in 'tangible harm.'"  Finazzo, 850 F.3d at 109 n.16 (quoting Mittelstaedt,

31 F.3d at 1217).  We drew this subtle line in Finazzo, for example, where we

explained that the question of harm in right-to-control cases is "a question of

fraudulent intent, requiring that defendants contemplated some actual,

cognizable harm or injury to their victims" by deceiving them.  Id. at 107 n.15.

By contrast, we noted, a false statement is material "if it has a natural tendency to

influence, or is capable of influencing, the decision of the decisionmaking body

1    to which it was addressed." Id. (quoting United States v. Corsey, 723 F.3d 366,

2    373 (2d Cir. 2013)).

3         In our view, there was sufficient evidence that Johnson made at least two

4    material misrepresentations capable of influencing Cairn's decisions.  First,

5    during his October 2011 phone call with Jarrosson, Johnson represented that

6    HSBC would not "ramp the fix."  App'x 389.  A reasonable jury could point to

7    the evidence of Johnson's subsequent efforts to conceal HSBC's role in ramping

8    the fix for HSBC's benefit and to Cairn's detriment as proof that Johnson knew

9    that this statement was false.  Johnson argues that his statement to Jarrosson was

10   not a lie because he informed Jarrosson that HSBC would buy pounds before the

11   fix was set.  We agree, based on the trial evidence, that Johnson disclosed HSBC's

12   intent to trade ahead of the fix.  But in doing so Johnson also misrepresented the

13   method by which HSBC would trade ahead.  As noted, he confirmed that HSBC

14   would "quietly" accumulate its position in pounds and suggested that HSBC

15   would not "ramp the fix," knowing how important each of these representations

16   about process was to Cairn.  App'x 386, 389.  Contrary to these representations,

17   however, Johnson directed Cahill to ramp the fix to a rate just below 1.5730.

1       There was ample evidence for a reasonable jury to find that Johnson's

2 misrepresentations not only could, but in fact did, influence Cairn's decision as

3 to the type of transaction to undertake.  After his phone call with Johnson,

4 Jarrosson recommended that Cairn engage HSBC to do a Fixing Transaction;

5 HSBC and Cairn signed the Mandate Letter, which described a Fixing

6 Transaction as one of two alternative methods (the other being a Full-Risk

7 Transfer); and Cairn ultimately selected a Fixing Transaction.

8       Johnson contends that none of his misrepresentations were material

9 because the cost to Cairn would have been even greater had it elected to proceed

10 with a Full-Risk Transfer rather than a Fixing Transaction.  We reject that

11 argument because it rests on a misunderstanding of the question before us.  As

12 we have explained, the "question of whether a defendant's misrepresentation

13 was capable of influencing a decisionmaker" in a right-to-control case "should

14 not be conflated with [the] requirement that that misrepresentation be capable of

15 resulting in tangible harm."  Finazzo, 850 F.3d at 109 n.16 (quotation marks

16 omitted).  So "[i]t is . . . possible for a misrepresentation to influence

17 decisionmaking in a manner that nevertheless does not produce tangible harm."

18 Id.; see also Neder, 527 U.S. at 16, 24.

1    Johnson's second material misrepresentation occurred on December 7 after

2    the 3 p.m. fix, during a debriefing call between HSBC, Cairn, and Rothschild.  In

3    explaining why the market had moved so dramatically during the hour before

4    the fix, Johnson's colleague, Scott, suggested that the Russian Central Bank was

5    responsible.  Johnson confirmed that the Russian Central Bank was "always

6    selling dollars."  App'x 340.  The next day, Johnson acknowledged that he knew

7    the Russian Central Bank story was untrue:  He recounted that when Cairn asked

8    why the fix rate had jumped, "we said the usual, Russian names, other central

9    banks, all that sort of stuff."  Gov't App'x 137.

10    On appeal, Johnson asserts that his statement about the Russian Central

11    Bank was not material because it was made after the FX Transaction, and the

12    Mandate Letter prevented Cairn from walking away from the transaction after it

13    was done.  But Cairn was not stuck with the FX Transaction once it was

14    completed.  It could have, among other things, sought immediate legal action on

15    the ground that it had been defrauded.  We think that a reasonable jury therefore

16    could have viewed Johnson's post-transaction misrepresentations as influencing

17    Cairn's decision not to pursue various courses of action immediately after the

18    fact.

1    2.  <u>Due Process</u>

2        The Due Process Clause of the Fifth Amendment provides that "[n]o

3    person shall . . . be deprived of life, liberty, or property, without due process of

4    law."  U.S. CONST. amend. V.  "[T]he Government violates this guarantee by

5    taking away someone's life, liberty, or property under a criminal law so vague

6    that it fails to give ordinary people fair notice of the conduct it punishes, or so

7    standardless that it invites arbitrary enforcement."  <u>Johnson v. United States</u>, 135

8    S. Ct. 2551, 2556 (2015) (citing <u>Kolender v. Lawson</u>, 461 U.S. 352, 357–58 (1983)).

9        Johnson argues that his convictions violated his Fifth Amendment right to

10   due process for two reasons.  First, he claims that he lacked fair warning that his

11   actions were illegal, especially since there was (and, according to Johnson,

12   apparently still is) no rule prohibiting trading ahead of a fix.  Second and

13   relatedly, he points out that the Government "is unable to explain when a fix

14   transaction becomes criminal wire fraud," rendering it a standardless crime.

15   Appellant's Br. 52.  Neither argument has merit.

16       As for the first argument, Johnson claims that trading ahead of the fix, or

17   so-called "frontrunning," is perfectly legal in the foreign exchange market.

18   Indeed, he points out, in 2011 banks routinely executed fixing transactions by

1    trading ahead of the fix.  But Johnson was not convicted of frontrunning.  He was

2    convicted of making material misrepresentations to Cairn about <u>how</u> HSBC

3    would trade ahead of the fix and the price would be determined.  As we

4    explained above, a reasonable jury could have found that these

5    misrepresentations affected Cairn's decisionmaking and deprived it of the right

6    to control its assets.  So we need not express an opinion on the law relating to

7    frontrunning in 2011.

8         We reject Johnson's second argument for similar reasons.  Johnson

9    describes his conviction as "unconstitutionally standardless" because, he says,

10   the Government is unable to explain when a fixing transaction becomes criminal.

11   Appellant's Br. 52.  But the standard is clear:  A defendant who executes a fixing

12   transaction engages in criminal fraud if he intentionally misrepresents to the

13   victim how he will trade ahead of the fix, thereby deceiving the victim as to how

14   the price of the transaction will be determined.

15        For these reasons, we reject Johnson's challenge to his convictions based on

16   the Due Process Clause.

17

18

1                                    **CONCLUSION**

2          We have considered Johnson's remaining arguments and conclude that

3    they are without merit or need not be addressed.  <u>See</u> <u>Rutkoske</u>, 506 F.3d at 176.

4    For the foregoing reasons, the judgment of conviction is **AFFIRMED**.