# 18-1503

IN THE

# United States Court of Appeals

**FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA,

*Appellee,*

—against—

STUART SCOTT,

*Defendant,*

MARK JOHNSON,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## PETITION FOR REHEARING EN BANC

FRANK H. WOHL
JOHN R. WING
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue, 33rd Floor
New York, New York 10110
(212) 921-8399

ALEXANDRA A.E. SHAPIRO
*Counsel of Record*
ERIC S. OLNEY
JACOB S. WOLF
SHAPIRO ARATO BACH LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION .............................................................................1

BACKGROUND .................................................................................3

      A.   Relevant Facts ....................................................................3

      B.   Procedural History ............................................................7

REASONS FOR GRANTING REHEARING OR REHEARING EN BANC .......8

  I.   THE PANEL'S OVERBROAD DEFINITION OF FRAUD
      CONFLICTS WITH BINDING PRECEDENT AND UNDERMINES
      THE STABILITY OF GLOBAL MARKETS ...........................................9

      A.   The Panel Erroneously Held That An Oral Promise Expressly
          Superseded By A Subsequent Written Contract Can Be
          Fraudulent .........................................................................9

      B.   The Panel Erroneously Held That Parties Are Not Bound By
          Completed Foreign Exchange Trades ...........................................15

      C.   The Panel's Refusal To Address Misappropriation Conflicts
          With Binding Precedent .................................................................17

CONCLUSION ......................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.*,
869 F.3d 598 (7th Cir. 2017) ................................................................12

*Aon Fin. Prods., Inc. v. Societe Generale*,
476 F.3d 90 (2d Cir. 2007) ....................................................................5

*Consarc Corp. v. Marine Midland Bank, N.A.*,
996 F.2d 568 (2d Cir. 1993) ................................................................13

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
595 F.3d 458 (2d Cir. 2010) ................................................................10

*McDonnell v. United States*,
136 S. Ct. 2355 (2016)............................................................................1

*Mizuna, Ltd. v. Crossland Fed. Sav. Bank*,
90 F.3d 650 (2d Cir. 1996) ........................................................... 10, 11

*Morgan Stanley Grp. Inc. v. New England Ins. Co.*,
225 F.3d 270 (2d Cir. 2000) ................................................................18

*N. Atl. Instruments, Inc. v. Haber*,
188 F.3d 38 (2d Cir. 1999) ..................................................................11

*Neder v. United States*,
527 U.S. 1 (1999)....................................................................................9

*One-O-One Enters., Inc. v. Caruso*,
848 F.2d 1283 (D.C. Cir. 1988)...........................................................11

*Phillips v. Audio Active Ltd.*,
494 F.3d 378 (2d Cir. 2007) ................................................................18

*Radiation Dynamics, Inc. v. Goldmuntz*,
464 F.2d 876 (2d Cir. 1972) ................................................................15

ii

*Red Ball Interior Demolition Corp. v. Palmadessa*,
   173 F.3d 481 (2d Cir. 1999) ................................................................10

*Robinson v. Cupples Container Co.*,
   513 F.2d 1274 (9th Cir. 1975) ............................................................12

*Sekhar v. United States*,
   570 U.S. 729 (2013) .............................................................................9

*Skilling v. United States*,
   561 U.S. 358 (2010) .............................................................................1

*Steiner v. Lewmar, Inc.*,
   816 F.3d 26 (2d Cir. 2016) ................................................................10

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
   822 F.3d 650 (2d Cir. 2016) ........................................................ 10, 14

*United States v. Binday*,
   804 F.3d 558 (2d Cir. 2015) ...........................................................9, 12

*United States v. Bogucki*,
   18-cr-21 (CRB), 2019 WL 1024959 (N.D. Cal. Mar. 4, 2019)..........12

*United States v. Castleman*,
   134 S. Ct. 1405 (2014) .........................................................................9

*United States v. Chestman*,
   947 F.2d 551 (2d Cir. 1991) ..............................................................18

*United States v. Garcia*,
   992 F.2d 409 (2d Cir. 1993) ..............................................................18

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015) ..............................................................12

*United States v. Litvak*,
   889 F.3d 56 (2d Cir. 2018) ................................................................12

*United States v. Rutkoske*,
  506 F.3d 170 (2d Cir. 2007) ...................................................................18

*United States v. Shellef*,
  507 F.3d 82 (2d Cir. 2007) .......................................................................9

*United States v. Szur*,
  289 F.3d 200 (2d Cir. 2002) ...................................................................18

*United States v. Weimert*,
  819 F.3d 351 (7th Cir. 2016) ..................................................................13

*Vacold LLC v. Cerami*,
  545 F.3d 114 (2d Cir. 2008) ...................................................................15

*Wall v. CSX Transp., Inc.*,
  471 F.3d 410 (2d Cir. 2006) ...................................................................10

**Statutes and Other Authorities**

12 U.S.C. §5461(a)(1)................................................................................16

26 Williston on Contracts §69:11 (4th ed.)..............................................10

Bank for Int'l Settlements, *Supervisory Guidance for Managing Risks Associated with the Settlement of Foreign Exchange Transactions* (Feb. 2013), available at https://www.bis.org/publ/bcbs241.pdf.................................................17

Fed. Res. Bank of N.Y., *Foreign Exchange Transactions: Execution to Settlement Recommendations for Non-Dealer Participants* (Jan. 2016), available at https://www.newyorkfed.org/medialibrary/microsites/fxc/files/2016/fxc011916.pdf ...................................................................... 16, 17

SEC, *About Settling Trades in Three Days: Introducing T+3* (May 21, 2004), available at https://www.sec.gov/reportspubs/investor-publications/investorpubstplus3htm.html...................................................................17

SEC Release No.34-80295..........................................................................16

# INTRODUCTION

The government often wields fraud statutes as "meat axes" in hopes of criminalizing a staggeringly broad swath of behavior.[1]  The Supreme Court rejects these efforts and insists upon narrow constructions to avoid trampling due process, separation of powers, and federalism.  *E.g.*, *Skilling v. United States*, 561 U.S. 358 (2010).  Then the government tries again.  The latest example is the Department of Justice's efforts to police transactions between commercially sophisticated businesspeople, using expansive fraud definitions to rewrite their contracts.  Many cases involve bluffing and other standard "deceptive" negotiating tactics between "big boys" who know they shouldn't trust each other.  The criminal charges often shock industry participants and raise serious fair notice issues, creating what one judge termed "a massive due process problem."[2]

This Court has considered a few such cases but has not squarely confronted the threat they pose to financial market stability.  It is exceptionally important that this Court, given its historic role in this area, draw clear lines ensuring that arms-length counterparties can enter contracts without risking that federal prosecutors will later label their negotiating positions fraud.

---

[1] *McDonnell v. United States*, 136 S. Ct. 2355, 2373 (2016).

[2] *United States v. Bogucki*, 18-cr-21 (CRB), ECF.226, Tr.1013 (Feb. 28, 2019).

This case presents an ideal vehicle in which to do so en banc. It stems from a $3.5 billion foreign currency exchange between two arms-length counterparties—a U.K. public company and a U.K. bank. The bank complied with the contract governing the transaction and violated no law, rule, or industry practice. The counterparty never complained to the authorities. Nevertheless, the government prosecuted Petitioner, the bank's foreign exchange head, for wire fraud. The panel interpreted fraud expansively to affirm his conviction for conduct that would not withstand a motion to dismiss a civil suit. Its opinion conflicts with controlling Supreme Court and Second Circuit precedents and risks upending settled expectations of businesses that depend on their contracts' enforceability.

First, the panel ruled that an oral "promise" about future performance can be fraudulent even if *excluded* from a subsequent contract expressly superseding any oral representations. That conflicts with the Supreme Court's directive to interpret mail/wire fraud consistent with the common law, and this Court's decisions holding such promises unenforceable under common-law principles.

Second, the panel held that a misrepresentation *after* a trade's completion can be material. This contravenes Circuit precedent establishing that once parties commit to a transaction, subsequent misstatements are immaterial. The panel's holding would enable parties to unilaterally abandon deals—creating systemic risks that the Federal Reserve Bank and SEC have warned would undermine

2

financial markets' stability.

At a minimum, rehearing is warranted because the panel erroneously refused to address another legal challenge that requires a new trial.

## BACKGROUND

### A. Relevant Facts

Cairn Energy, a multi-billion-dollar Scottish conglomerate, announced in 2010 that it would sell a foreign asset and distribute approximately $4 billion in proceeds to shareholders. Attachment-4. To achieve this, Cairn would convert the dollars to British pounds. Cairn retained Rothschild, a leading investment bank, "to advise it" for this conversion. *Id.*

In October 2011, Cairn considered proposals from nine banks, including HSBC, for the currency exchange. Petitioner Mark Johnson was the London-based leader of HSBC's $2.5 billion foreign exchange business. (A-228).

Cairn assessed various conversion methods and ultimately chose a "fix" benchmark exchange rate published hourly. (A-279). With this method, parties agree to exchange currencies at the "fix" rate at a specified future time. Banks charge no fee but try to make money by "beating the fix." (A-127-28). In a transaction this large, the pound's price likely rises as the bank buys pounds in significant quantities. (A-58-59). If it does, the bank profits by selling the counterparty pounds at the higher price. (A-56). Cairn understood HSBC's

3

trading would "pressure the fixing" this way and "expect[ed] [HSBC] would make money" by "beat[ing] the fix." (A-136, A-397).

On October 13, Rothschild's Francois Jarrosson called Johnson and asked how much advance notice HSBC would need for a fix.[3] Johnson responded: HSBC needed a "minimum of two hours" to avoid undue upward pressure on the fix rate; only "30 minutes" notice would "cause a lot of noise" because HSBC would have "a lot to buy"; "the more time we have…the more quietly we can just accumulate the position" to provide "a fair price." Attachment-5-6; (A-386-87). Jarrosson asked whether HSBC would "share some upside" if it earned substantial profits. (A-389). Johnson refused, stating that if a bank agrees in advance to share profits, "you're doing it cause you're intending to ramp the fix," *i.e.*, pressure the rate higher. (A-389). The government called this "a promise" that "HSBC isn't going to ramp the fix." (A-250).

On October 20, 2011, Rothschild recommended "a fixing," but warned: "Cairn is not in control of timing during the 2hrs between notice and fixing," "[m]arkets could move against Cairn," and there is "[r]isk of market disruption owing to a compressed execution window." (A-304, A-307).

---

[3] The two were industry equals. https://register.fca.org.uk/ ShPo_IndividualDetailsPage?id=003b000000LUwwDAAT; https:// register.fca.org.uk/ShPo_IndividualDetailsPage?id=003b000000LV9d3AAD.

4

Cairn selected HSBC.  Cairn "wanted to lock in key terms" and insisted on a written agreement memorializing each party's obligations.  (A-129).  Rothschild drafted that contract ("Mandate Letter"), which Cairn's counsel scrutinized.  (A-444-47, A-129-30).  The contract committed HSBC to converting up to $4 billion at Cairn's request using any of three methods.  If Cairn chose a "fixing" it had to give two hours' advance notice.  (A-309).

The contract also required that any transaction be "governed by" the parties' International Swap Dealers Association Master Agreement ("ISDA"), a widely-used agreement that "governs the legal and credit relationship between the parties." *Aon Fin. Prods., Inc. v. Societe Generale*, 476 F.3d 90, 93 n.4 (2d Cir. 2007).  Critically, the ISDA "*supersedes all oral communication*" between the parties "with respect to its subject matter."  (A-362).  Nothing in the Mandate Letter or ISDA restricted how HSBC would accumulate pounds to fill Cairn's order.  The contract established an arms-length relationship and disclaimed any fiduciary, agency, or advisory relationship.  (A-310, A-373).

On December 7 at 1:51pm, Cairn instructed HSBC to exchange approximately $1.2 billion at the 3pm fix rate, providing one hour's notice instead of the mandated two.  At 2:25pm, *35 minutes* before the fix rate would be set, Cairn replaced that order with one for *£2.25 billion*.  (A-325-26).  By then, HSBC had purchased a significant number of pounds.  (A-401).

5

HSBC trader Frank Cahill testified Johnson "didn't" give him "any direction" about "how to execute." (A-149-50). Cahill traded "the same way [he] normally trade[s] fixes," and used strategies to minimize increases in the pound's price and some "aggressive" methods. (A-171-73, A-206-07); Attachment-8.

At 2:54pm, upon learning HSBC was still £1.2 billion short, Johnson authorized Stuart Scott, who was supervising Cahill, not to "ramp" higher than the price would have been under an alternative conversion method Cairn had rejected. Johnson also twice directed Scott to "go short some" to reduce upward pressure on the pound's price. (A-335-36). Cahill never received these instructions and purchased the remaining pounds in the next six minutes, when the pound's price increased significantly. (A-399).

On a 3:15pm call after the transaction, Scott told Cairn HSBC began "taking action" at 2:55pm. (A-338-39). Cairn knew purchasing £2.25 billion in the *five minutes* before 3pm would have significantly ramped up the price. Yet Cairn didn't complain or suggest HSBC should have spread its trades out more evenly to try to reduce the fix price. During that call, Scott (allegedly falsely) attributed an unspecified portion of the rate increase to "the Russian Central Bank" "buying" pounds before 3pm. (A-339). Johnson remarked that "Central Banks" are "always selling dollars." (A-340).

The government's experts couldn't identify any plausible alternative

6

execution method; one conceded HSBC's was the "normal way" to trade fixes. (A-58-59, A-182-83). No rules dictated how the bank should trade Cairn's order. (A-59). Congress, the Treasury Department, and the CFTC have deliberately chosen not to regulate sophisticated counterparty exchanges or subject them to Commodities Exchange Act anti-fraud provisions. (*See* Br. of Amicus Curiae ACI-The Financial Markets Association, ECF.73, at 21-23).

HSBC earned only 0.2% of the $3.5 billion, $7.2 million. (A-210-11).

## B. Procedural History

The indictment charged conspiracy and wire fraud. The primary, "misappropriation," theory alleged Johnson "breach[ed] HSBC's duty of trust and confidence" to Cairn by purchasing pounds before the fix. (A-28). The second, "right to control," theory was that the transaction was "executed in a manner designed to cause the price of [pounds] to spike" "despite HSBC's representations…to avoid adverse market impact to" Cairn. (A-28-29). The jury was permitted to convict on either theory and rendered a general guilty verdict.

On September 16, 2019, the panel affirmed on "right to control," but erroneously refused to address Johnson's legal challenge to misappropriation, mislabeling it factual. Attachment-27. The panel held that Johnson's supposed October 13 promise not to ramp "misrepresent[ed]" "an essential element of the parties' bargain" and was "capable of influencing Cairn's decisionmaking." *Id*.

7

The panel also held that the purported post-fix "Russian Central Bank" misrepresentation was itself material because "Cairn was not stuck with the FX Transaction once it was completed," and "could have sought to unwind the transaction before settlement, withhold payment, or seek immediate legal action." Attachment-45.

Johnson petitioned for rehearing. On December 16, 2019, the panel issued an amended opinion which, *inter alia*, modified the sentence suggesting ways Cairn could have undone the deal after its completion. The panel replaced the *express* references to unwinding the transaction and withholding payment with "among other things," such that the relevant passage now reads: "[Cairn] could have, among other things, sought immediate legal action." Attachment-21. The panel didn't explain why it made this change or what "other things" would allow Cairn to unilaterally exit the deal.

## REASONS FOR GRANTING REHEARING EN BANC

This prosecution exemplifies why federal prosecutors should not inject themselves into private commercial relationships in complex markets they do not understand. Johnson has been sentenced to prison based on an argument that would not be civilly actionable. In affirming his conviction, the panel set the bar for fraud so low that its decision threatens to undermine the proper functioning of global markets. Because the panel's decision contravenes settled law in

8

exceptionally important ways, rehearing en banc is warranted.

## I. THE PANEL'S OVERBROAD DEFINITION OF FRAUD CONFLICTS WITH BINDING PRECEDENT AND UNDERMINES THE STABILITY OF GLOBAL MARKETS

### A. The Panel Erroneously Held That An Oral Promise Expressly Superseded By A Subsequent Written Contract Can Be Fraudulent.

1.      Schemes to deprive a victim of the "right to control" its assets

constitute wire fraud only if they misrepresent "an essential element of the

bargain." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007).  There is no

wire fraud where "the purported victim received the full economic benefit of its

bargain." *United States v. Binday*, 804 F.3d 558, 570 & n.10 (2d Cir. 2015)

(collecting cases).  The panel accepted this principle, but held that Johnson's

alleged oral promise about "how the FX Transaction would be conducted and the

price of the FX Transaction" was "an essential element of the parties' bargain"—

even though it was excluded from, and expressly superseded by, the subsequent

written agreement.  Attachment-3, 17-18.  Binding precedent forecloses that

holding.

The Supreme Court requires courts to give terms in federal criminal statutes

their common-law meanings.  *See*, *e.g.*, *United States v. Castleman*, 134 S. Ct.

1405, 1410 (2014); *Sekhar v. United States*, 570 U.S. 729, 732-33 (2013); *Neder v.

United States*, 527 U.S. 1, 23 (1999).  Thus, the wire-fraud statute must be

9

interpreted consistently with "the common-law understandings of fraud principles." *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 656 (2d Cir. 2016).

The panel defied hornbook common-law principles by injecting an extrinsic oral promise into the parties' bargain. "[C]ourts may not…add or excise terms" from sophisticated parties' agreements, *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010), or "impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself," *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999) (Sotomayor, J.); *accord, e.g., Steiner v. Lewmar, Inc.*, 816 F.3d 26, 32 (2d Cir. 2016). That is especially true for an extrinsic oral promise that the parties deliberately excluded from their fully integrated agreement. Where such a promise "is so clearly connected with the contract's provisions that the parties could have been expected to embody it in [the] writing," it "cannot be separately enforced." *Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 660 (2d Cir. 1996). And an unenforceable promise cannot be repackaged as a civil fraud claim, let alone a criminal prosecution. *See, e.g., Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006); 26 Williston on Contracts §69:11 (4th ed.).

Johnson's alleged promise not to "ramp" on October 13 was extrinsic to the subsequent agreement and unenforceable. Cairn insisted upon and drafted a

10

writing to "lock in key terms." (A-129). If Cairn wanted to enforce any supposed promises about "how the FX Transaction would be conducted and the price of the FX Transaction" (Attachment-17-18), Cairn could have bargained for them in the contract. Yet it never proposed *any* terms addressing how HSBC would purchase pounds to fill Cairn's order, or what the price would be.[4]

And the written contract expressly disclaims any oral promises: "This Agreement constitutes the entire agreement and understanding of the parties" and "supersedes all oral communication." (A-362 (§9(a)). The panel's conclusion that the written contract did not include all the "essential element[s] of the parties' bargain" (Attachment-3, 17) simply "cannot be squared" with this "merger clause." *Mizuna*, 90 F.3d at 659. "On a matter of such large significance to the parties' bargain, silence in a final agreement containing an integration clause…must be deemed an abandonment or excision of those earlier representations." *One-O-One Enters., Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988) (R.B. Ginsburg, J.) (rejecting fraud claim); *accord N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 48 (2d Cir. 1999) (parol evidence irrelevant where unambiguous contract contains "merger clause").

2.      Because Johnson's alleged promise was not "reasonably capable of

---

[4] The agreement addressed market disruption only by requiring *Cairn* to give HSBC "2 hours notice prior to [the] fixing"—a provision Cairn violated. (A-309).

11

influencing" a counterparty in Cairn's shoes, it was also legally immaterial. *United States v. Litvak*, 808 F.3d 160, 172 (2d Cir. 2015); *id.* at 185 ("sophistication" of alleged victim pertinent to materiality); *United States v. Litvak*, 889 F.3d 56, 59 (2d Cir. 2018) ("idiosyncratic and erroneous belief" of sophisticated counterparty "irrelevant"); *United States v. Bogucki*, 18-cr-21 (CRB), 2019 WL 1024959, at *4-7 (N.D. Cal. Mar. 4, 2019) (granting acquittal in similar FX wire-fraud prosecution because misstatements were immaterial in light of ISDA and parties' sophistication).

If it "had been material to the decision to enter into the agreement, it ought to have been spelled out in the agreement." *Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.*, 869 F.3d 598, 608 (7th Cir. 2017) (dismissing fraud where allegedly-violated oral promise was excluded from "sophisticated" parties' "integrated" written agreement); *Robinson v. Cupples Container Co.*, 513 F.2d 1274, 1277 (9th Cir. 1975) (promise "cannot be…material" where final "contract made no provision" for it).

The panel nowhere explained how actionable fraud could arise from an unenforceable extrinsic promise that directly conflicts with the subsequent agreement. It relied principally on *Binday*, a totally inapposite case involving neither an integrated agreement nor an extrinsic oral promise, but rather lies about facts affecting insurance policy prices. 804 F.3d at 566-67, 576.

12

3.      The panel's holding undermines settled expectations of parties to a vast array of commercial transactions.  Sophisticated parties—especially foreign parties transacting on foreign soil—must be able to rely on written agreements without worrying that U.S. prosecutors will try to imprison them by inserting terms they intentionally excluded.

The decision also transforms any stray remark during contract negotiations into a potential "fraud" (and enforceable obligation).  Yet in "complex transactions, negotiations would be chilled were a person later to be held bound by every chance promise made.  In such situations, the legal obligation must await the execution of a formal written agreement."  *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 570 (2d Cir. 1993).

The panel's holding enables the government to transform commonplace negotiating techniques like bluffing into binding promises.  Here the government divined a "promise" not to "ramp" in Johnson's stated reason for refusing to guarantee Cairn a share of the bank's profits.  G.Br.27-28; *see* Attachment-6-7.  Even if it wasn't the real reason, "[d]eception about negotiating positions…should not be considered material for purposes of mail and wire fraud statutes."  *United States v. Weimert*, 819 F.3d 351, 358 (7th Cir. 2016).

Finally, the panel's decision shows that the scienter requirement will not prevent these problems.  The panel interpreted Johnson's October 13 comments as

13

a representation that "the price" to Cairn "would be determined under particular conditions"—namely, "HSBC would purchase pounds 'quietly' without ramping" and "would seek a profit of just 'a few pips.'"  Attachment-17.  But "the particular conditions" Johnson was talking about were "an ideal world" where Cairn provided a "minimum of two hours" notice, not "30 minutes," which would create "too much noise."  (A-386-87).  Johnson explained: "The more time we have,…the more quietly we can just accumulate the position."  (A-386).  That "ideal world" never materialized, because Cairn didn't give two hours' advance notice. Johnson's October 13 predictions about what HSBC could do in the "perfect world" were not *knowingly false* promises about what HSBC would do in the "noisy" real-world conditions created by Cairn's late order on December 7 (a suboptimal month for fix trading, DX1410).  *See O'Donnell*, 822 F.3d at 658 (requiring proof of "contemporaneous intent to defraud," whereby defendant intended to breach promise *when* he made it).  And HSBC immediately began buying pounds upon learning Cairn would place its first order, demonstrating that Johnson never intended to ramp the price by trading at the last minute. Attachment-8.  If this proves scienter, few negotiating parties are safe from prosecution.

14

## B.    The Panel Erroneously Held That Parties Are Not Bound By Completed Foreign Exchange Trades.

The panel held that Johnson's purported "misrepresentation" on the post-fix call was a second "material" false statement because "Cairn was not stuck with the FX Transaction once it was completed" and "could have, among other things, sought immediate legal action."  Attachment-21.  Although the amended opinion excised the prior references to unwinding before settlement and withholding payment, in favor of a vague allusion to "other things," the upshot is the same:  the panel held that Cairn could unilaterally evade its contractual obligations *after* an enormous and risky foreign exchange deal was completed.  The panel cited no authority for this proposition, which first surfaced in the government's appellate brief.  It defies controlling precedent (Reply.Br.17-18) and the settled expectations of market participants that once committed to a transaction, parties must settle.[5]

The "formal closing date" is irrelevant to whether a misstatement was material.  *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890-91 (2d Cir. 1972); *accord Vacold LLC v. Cerami*, 545 F.3d 114, 122 (2d Cir. 2008).  "The proper date…to determine materiality" is "when the parties to the transaction are committed to one another," which in securities or FX transactions occurs before "the formal closing date."  *Radiation Dynamics*, 464 F.2d at 890-91.

---

[5] This includes Cairn, which wanted to offload the dollars immediately.  (DX316).

"Commitment" occurs when "the parties obligated themselves to perform," "even if the formal performance of their agreement is to be after a lapse of time." *Id.* at 891. Here, the parties were already committed when the post-fix statements were made. The contract specified that the parties were "legally bound by the terms of [the] Transaction from the moment they agree[d] to those terms (whether orally or otherwise)." (A-362 §9(e)(ii)). That "moment" occurred when Cairn placed orders mandating HSBC to sell it £2.25 billion at the 3pm fix. (A-325-26). Any subsequent statements cannot be material because there was no decision for them to induce.[6]

The panel's unprecedented holding threatens to disrupt global financial markets, whose "proper functioning…is dependent upon safe and efficient arrangements for the…settlement of payments, securities, and other financial transactions." 12 U.S.C. §5461(a)(1). Allowing parties to unilaterally unwind committed transactions would pose "systemic risk" threatening "stability and efficiency" of the "financial sector." SEC Release No.34-80295, at 41-43. The Federal Reserve Board warns that the risk of nonpayment by one party "could

---

[6] The government's witnesses understood the transaction couldn't be unwound after 3pm. (A-150-51 (at 3pm "the transaction was complete, and the pounds were then sold"); Tr.1146 (3pm is "the point at which…Cairn now owns the pounds")). *See* https://www.newyorkfed.org/medialibrary/microsites/fxc/files/2016/fxc011916.pdf, p.6 ("Once executed, FX transactions constitute binding obligations of both parties to the transaction.").

16

cause [the other] a large, even catastrophic, loss."[7]

The panel's holding that a post-transaction misstatement can be *independently* material because the "victim" might have sued for fraud is equally unprecedented, and utterly nonsensical. Cairn would only have a *valid* fraud suit if it had been fraudulently induced to transact with HSBC to begin with. If that had happened, later misstatements might evidence a cover-up, or toll the limitations period, but contrary to the panel's holding, wouldn't constitute a separate material fraud. And since the transaction was *not* induced by fraud (*see* Point I.A), any post-hoc deceit would, at most, have deterred a *meritless* fraud suit and thus plainly be immaterial. Yet under the panel's theory, people can be imprisoned for misstatements that merely dissuade or delay meritless civil actions, which are plainly not criminal.

## C. The Panel's Refusal To Address Misappropriation Conflicts With Binding Precedent.

When a jury considering multiple theories "renders a general verdict of guilty," "evidentiary" challenges fail if there is sufficient evidence to support one theory, whereas "if the challenge is legal and any of the theories was legally

---

[7] https://www.newyorkfed.org/medialibrary/microsites/fxc/files/2016/
fxc011916.pdf, p.13; *see also* https://www.sec.gov/reportspubs/investor-
publications/investorpubstplus3htm.html (risks of "[u]nsettled trades");
https://www.bis.org/publ/bcbs241.pdf, pp.27, 29 (serious risks to banks if
counterparty "fail[s] to settle an FX trade" and "contractual FX obligations are
non-binding").

insufficient, then the verdict must be reversed." *United States v. Garcia*, 992 F.2d 409, 416 (2d Cir. 1993).

Misappropriation required proof HSBC had a "fiduciary" or "similar relationship of trust and confidence" with Cairn. *United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991). But the contract said HSBC was "not acting as a fiduciary for or as an adviser" to Cairn (A-373), and that it did not "creat[e] any form of advisory or other relationship" between the parties (A-310). These disclaimers bar any fiduciary-like relationship *as a matter of law,* because contract interpretation is "a matter of law for the court to decide." *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000); *accord Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007); Br.26-36.

By disregarding misappropriation's legal defect, the panel contravened *United States v. Szur*, 289 F.3d 200, 208 (2d Cir. 2002). There, this Court held that if "no fiduciary duty could exist between the [defendants] and their customers as a matter of law," and at least one possible conviction theory relied on legally "invalid" fiduciary duties, "the jury's verdict must be overturned." *Id*. The panel cited *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007), but that involved merely *factual* sufficiency challenges. Attachment-13. Accordingly, at a minimum, rehearing is warranted to consider Johnson's misappropriation-theory challenge, which requires a new trial.

18

## CONCLUSION

For the foregoing reasons, this Court should grant rehearing en banc.

Dated:      New York, New York
             December 30, 2019

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
*Counsel of Record*
Eric S. Olney
Jacob S. Wolf
SHAPIRO ARATO BACH LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

Frank H. Wohl
John R. Wing
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, New York 10110
(212) 921-8399

*Attorneys for Defendant-Appellant
Mark Johnson*

19

# Attachment

# TABLE OF CONTENTS

Amended Opinion (December 16, 2019)................................................Attachment-1

Vacated Opinion (September 12, 2019).............................................Attachment-25

1    **UNITED STATES COURT OF APPEALS**
2    **FOR THE SECOND CIRCUIT**
3
4    August Term, 2018
5
6    (Argued: May 31, 2019          Decided:  September 12, 2019
7    Amended: December 16, 2019)
8
9    Docket No. 18-1503-cr
10
11   _____
12
13   UNITED STATES OF AMERICA,
14
15   *Appellee,*
16
17   v.
18
19   MARK JOHNSON,
20
21   *Defendant-Appellant.*[*]
22
23   _____
24
25   Before:
26
27   CALABRESI and LOHIER, *Circuit Judges*, and DONNELLY, *District Judge*.[**]
28
29   Mark Johnson, the former global head of the foreign exchange trading
30   desk at the investment bank HSBC, was convicted by a jury of wire fraud and
31   conspiracy to commit wire fraud in connection with a foreign currency exchange
32   transaction with Cairn Energy.  At trial, the Government argued, among other
33   things, that Johnson denied Cairn the right to control its assets by depriving it of

---

[*] The Clerk of Court is directed to amend the official caption to conform with the above.
[**] Judge Ann M. Donnelly, of the United States District Court for the Eastern District of
New York, sitting by designation.

1   information necessary to make its own discretionary economic decisions.
2   Johnson argues that there was insufficient evidence for a reasonable jury to
3   convict him under a right-to-control theory because Cairn received the benefit of
4   its bargain in the transaction and any misrepresentations Johnson may have
5   made were immaterial.  We conclude that there was sufficient evidence to
6   convict Johnson on the right-to-control theory because a reasonable jury could
7   conclude that his misrepresentations to Cairn related to the price of the
8   transaction and were capable of influencing Cairn's decisionmaking.
9   **AFFIRMED.**
10
11                          LAUREN HOWARD ELBERT, Assistant United States
12                          Attorney (David C. James, Assistant United States
13                          Attorney, Carol Sipperly, Brian Young, Assistant Chiefs,
14                          Blake Goebel, Trial Attorney, United States Department
15                          of Justice, *on the brief*), *for* Richard P. Donoghue, United
16                          States Attorney, Eastern District of New York,
17                          Brooklyn, NY, *for Appellee* United States of America.
18
19                          ALEXANDRA A.E. SHAPIRO, Shapiro Arato LLP, New
20                          York, NY (Eric S. Olney, Jacob S. Wolfe, Shapiro Arato
21                          LLP, New York, NY, Frank H. Wohl, John R. Wing,
22                          Lankler Siffert & Wohl LLP, New York, NY, *on the brief*),
23                          *for Defendant-Appellant* Mark Johnson.

24   LOHIER, *Circuit Judge*:

25         Mark Johnson, the former global head of the foreign exchange trading

26   desk at the investment bank HSBC, was convicted by a jury of wire fraud and

27   conspiracy to commit wire fraud in connection with a foreign currency exchange

28   transaction with Cairn Energy.  At trial and on appeal, the Government argued

29   that Johnson could be convicted on either of two theories of criminal liability:

30   (1) misappropriation of the confidential information of Cairn in breach of a duty

2

**Attachment-2**

1    of trust and confidence owed to Cairn; or (2) denial of Cairn's right to control its

2    assets by depriving it of information necessary to make discretionary economic

3    decisions.  In response, Johnson argues that there was insufficient evidence for a

4    jury to convict him under the misappropriation theory and also insufficient

5    evidence to convict him under a right-to-control theory because Cairn received

6    the benefit of its bargain and any misrepresentations that Johnson may have

7    made were immaterial.  We conclude that there was sufficient evidence to

8    convict Johnson on the right-to-control theory because a reasonable jury could

9    conclude that his misrepresentations to Cairn related to the price of the

10   transaction, which was an essential element of the parties' bargain, and were

11   capable of influencing Cairn's decisionmaking.  Accordingly, we need not reach

12   Johnson's arguments as to the misappropriation theory, and Johnson's conviction

13   is **AFFIRMED.**

14                                  BACKGROUND

15        1.  Facts

16        Because this is an appeal from a judgment of conviction entered after a

17   jury trial and Johnson challenges the sufficiency of the evidence against him, the

18   following facts are drawn from the trial evidence and described "in the light

3

**Attachment-3**

1    most favorable to the Government." United States v. Caltabiano, 871 F.3d 210,

2    213 (2d Cir. 2017).

3         A. Cairn Energy Selects HSBC to Perform a Large FX Transaction

4         Cairn, whose stock trades on the London Stock exchange, is one of

5    Europe's leading oil and gas firms. In August 2010 Cairn announced a plan to

6    sell a majority interest in one of its subsidiaries and to distribute a substantial

7    amount of the sales proceeds to its shareholders. Before Cairn could distribute

8    the proceeds, however, it had to first convert the U.S. dollars (USD) it received

9    from the sale into British pounds (GBP). Cairn retained Rothschild & Co., an

10   investment bank, to advise it on conducting a significant foreign currency

11   exchange transaction of up to four billion dollars for pounds (the FX

12   Transaction). Such a transaction involves trading one currency for another at the

13   exchange rate for the underlying currencies, whose values are governed by the

14   laws of supply and demand. Movements in exchange rates are measured in

15   "pips," and 100 pips is equivalent to one penny.

16        In 2011 Cairn sent Requests for Proposals (RFPs) to nine major banks to

17   execute the FX Transaction. HSBC responded to the RFP by recommending that

18   Cairn employ a method of currency exchange known as a Fixing Transaction.

**Attachment-4**

1    HSBC explained that a Fixing Transaction involved exchanging GBP for USD at

2    either a daily exchange rate that the European Central Bank published, or at an

3    hourly exchange rate that the company WM/Reuters published.  The parties

4    eventually agreed to use the hourly exchange rate published by WM/Reuters.[1]

5    To effectuate the transaction and to give HSBC time to buy the pounds to sell to

6    Cairn, HSBC requested that Cairn provide HSBC two hours' advance notice of

7    the hourly exchange rate, or fix, at which Cairn wanted to trade.  HSBC warned

8    that a Fixing Transaction involved some risk because Cairn would be exposed to

9    exchange rate fluctuations in the hours prior to the fix.  But HSBC also reassured

10   Cairn that it could "seamlessly execute a transaction of this magnitude without

11   creating excessive market volatility."  App'x 274.  HSBC further explained that a

12   Fixing Transaction provided transparency to Cairn's shareholders, who would

13   be able to see that Cairn paid no more than the published market rate.

14        About a week after HSBC's response to Cairn's RFP, Francois Jarrosson,

15   the Rothschild partner principally responsible for the Cairn engagement, spoke

16   with Johnson about a Fixing Transaction.  Johnson explained that having at least

---

[1] WM/Reuters calculated its hourly exchange rate by taking the "median average" of the price of trades published in a one-minute window, beginning 30 seconds before and finishing 30 seconds after the hour.  App'x 279.

5

**Attachment-5**

1    two hours' notice before the designated fix would allow HSBC to "more

2    quietly . . . accumulate" pounds for Cairn.  App'x 386.  But if Cairn gave HSBC

3    only thirty minutes' notice, Johnson warned, HSBC would have "a lot to buy"

4    and would "cause a lot of noise" in the market.  App'x 387.  Johnson also said

5    that HSBC would aim "to make a small amount of money out of [the Fixing

6    Transaction] clearly because that's . . . our business," but that HSBC also wanted

7    "a happy customer" who would get "a fair price."  App'x 387.  Jarrosson worried

8    that HSBC might make more than "a small amount of money" if it was able to

9    purchase pounds at an exchange rate much lower than the hourly fix that Cairn

10   would eventually be obligated to pay.  In that case, Jarrosson asked, would

11   HSBC be open to sharing "some [of the] upside" with Cairn?  App'x 389.

12   Johnson demurred, and answered that a bank that offered a discount on the fix

13   rate really intended to trade currency before the fix in such a way as to artificially

14   increase, or "ramp," the currency's price at the fix.  After ramping the fix,

15   Johnson added, such a bank would sell the currency to its counterparty at the

16   inflated fix, making up for any loss on the negotiated discount.  Johnson said that

17   he was "horrified" when he saw banks offering "the fix minus one pip" (in other

18   words, the exchange rate at the fix minus one hundredth of a cent), because those

6

**Attachment-6**

1    banks clearly intended to "ramp the fix" at the expense of the counterparty.

2    App'x 389–90.

3            Following his call with Johnson, Jarrosson recommended that Cairn

4    engage HSBC and use a Fixing Transaction to complete the currency exchange.

5            B.  The Mandate Letter

6            In late October 2011 Cairn and HSBC signed a "Mandate Letter" that

7    formally awarded Cairn's FX engagement to HSBC.  The Mandate Letter

8    committed HSBC to execute an FX Transaction at Cairn's request for an amount

9    up to $4 billion USD.  The Letter also gave Cairn the option of performing the

10   trade through a Fixing Transaction or a Full-Risk Transfer.  If Cairn chose a

11   Fixing Transaction, HSBC would be obligated to perform the transaction at a

12   price equivalent to a publicly available fix rate, provided that Cairn gave HSBC

13   around two hours' notice prior to the particular hourly fix that Cairn wanted to

14   use.  If Cairn chose a Full-Risk Transfer, HSBC would be obligated to perform the

15   transaction at the prevailing market rate at the time of Cairn's call plus, at most, a

16   100-pip charge.  The additional charge for the Full-Risk Transfer protected HSBC

17   against the currency risk it assumed by first guaranteeing Cairn a particular

18   GBP/USD exchange rate and only thereafter purchasing pounds to sell to Cairn.

1          C. _The FX Transaction_

2          On December 7, 2011, Cairn instructed HSBC that it wanted to buy 2.25

3    billion pounds for dollars using a Fixing Transaction at the day's 3 p.m. fix.

4    HSBC trader Frank Cahill had the job of executing Cairn's order.  Once Johnson

5    learned that the Fixing Transaction would happen that afternoon, however, he

6    began to tip off HSBC traders in New York and London to buy pounds.

7    Meanwhile, Cahill, unaware of the promise not to "ramp up" the price of

8    pounds, executed the Cairn transaction the way he had traded fixing transactions

9    "[a]lmost every day of [his] career."  App'x 150, 172.  To ensure a profit for

10   HSBC, Cahill bought pounds in a manner designed to increase their price, in part

11   by using "aggressive" buying techniques like "bidding through the market"

12   (which means putting in an offer to buy at a higher price than sellers' stated

13   prices).  App'x 154–55.  But a bank's buying spree tends to drive up the price of

14   the commodity that the bank is buying.  Had HSBC wanted to acquire pounds in

15   a way that kept their price "as low as possible," Cahill confirmed, he would have

16   tried to mask HSBC's buying spree by trading less aggressively.  App'x 155.

17          At 2:54 p.m. that day, Johnson called his colleague Stuart Scott, who was

18   with Cahill in London, to discuss what Cahill should do in the last few minutes

8

**Attachment-8**

1    before the 3 p.m. fix.  Johnson advised Scott that Cahill should not "ramp" the fix

2    above a 1.5730 GBP/USD exchange rate because Cairn "[couldn't] really

3    complain" so long as the 3 p.m. fix stayed below that rate.  App'x 335.  But if the

4    rate rose above 1.5730, Johnson said, Cairn would "squeal."  Id.  Johnson later

5    told a colleague that his team had to "make sure the fix [was] below [1.5730] or

6    [Cairn was] gonna feel [it had] been ripped off."  Gov't App'x 137.[2]  Johnson

7    apparently believed that Cairn would not complain if the fix rate stayed below

8    1.5730 because 1.5730 was 100 pips above 1.5630, the prevailing rate at the time

9    that Cairn placed its order with HSBC.  As Johnson surely knew, had Cairn

10   chosen instead to proceed with a Full-Risk Transfer, Cairn would have bought

11   the 2.25 billion pounds at an exchange rate of 1.5630 plus a 100-pip charge, for

12   precisely the same final rate of 1.5730.  Therefore, Johnson calculated, so long as

--------

[2] After publication of the original opinion in this appeal, Johnson moved to "clarify" the appellate record under Rule 10(e)(3) of the Federal Rules of Appellate Procedure because the Government included the wrong version of certain documents introduced at trial, including the transcript quoted here.  The Government, upon which the Court relies significantly to ensure the accuracy of the record in criminal appeals, has acknowledged its error.  Construing Johnson's motion as one to correct the record under Federal Rule of Appellate Procedure 10(e)(2), we grant the motion.  Accordingly, the above quotation reflects the language of the transcript actually introduced and presented to the jury at trial.  We nevertheless conclude that any difference between the correct documents introduced at trial and the versions that the Government erroneously included in its original appendix are not material to our resolution of the issues on appeal.

9

1   the final cost of the Fixing Transaction that Cairn requested stayed below what

2   the cost of a Full-Risk Transfer—even with its extra charge—would have been,

3   Cairn had nothing to complain about.

4          D. Outcomes for Cairn and HSBC

5          The published 3 p.m. fix on December 7, 2011 was 1.57185.  In a debriefing

6   conference call later that day, Cairn's treasurer expressed concern over the

7   increase in the GBP/USD exchange rate during the hour before 3 p.m.  In

8   explaining why the market had moved so much during that hour, Johnson's

9   colleague, Scott, suggested that the Russian Central Bank was responsible.

10  Johnson then corroborated Scott's statement, saying that the Russian Central

11  Bank was "always selling dollars."  App'x 340.  Although Johnson added that he

12  felt "comfortable" with the 3 p.m. rate because Cairn would have ended up with

13  a higher rate had it chosen a Full-Risk Transfer, App'x 339, he offered to return

14  2.5 pips to Cairn, for a final exchange rate of 1.57160.  The next day after the

15  conference call, Johnson appeared to confirm that he knew the Russian Central

16  Bank story was a lie, recounting to a colleague that when Cairn asked why the fix

17  rate had jumped, "we said the usual, Russian names, other central banks, all that

18  sort of stuff."  Gov't App'x 137.

10

**Attachment-10**

1    HSBC ultimately profited about $7 million on the transaction with Cairn.

2    2.  Procedural History

3        Johnson was indicted on one count of conspiracy to commit wire fraud, see

4    18 U.S.C. § 1349, and ten counts of wire fraud, see 18 U.S.C. § 1343.[3]  At trial, the

5    Government's primary theory of liability under the wire fraud statute was that

6    Johnson misappropriated Cairn's confidential information, in breach of a duty of

7    trust and confidence owed to Cairn, by driving up the fix rate in order to

8    generate secret profits for HSBC (the "misappropriation theory").  The jury was

9    accordingly instructed that in order to convict Johnson under that theory,

10   Johnson and Cairn must have entered into a relationship of "reliance and de

11   facto control and dominance."  Gov't App'x 103.

12       The Government also offered an alternative theory of liability.  Referring

13   to the central bargain between Cairn and HSBC, the Government told the jury

14   that Johnson had denied Cairn the right to control its assets by depriving it of

15   information necessary to allow it to make discretionary economic decisions (the

16   "right-to-control theory").  Further to this theory, the District Court instructed

17   the jury that Johnson must have made "misrepresentations or non-disclosures"

---

[3] Johnson's colleague, Scott, was also indicted but is still in the United Kingdom and has
contested extradition.

**Attachment-11**

1    to Cairn that went "to the heart of Cairn's bargain with HSBC" and could or did

2    "result in tangible economic harm to Cairn."  Gov't App'x 105.  It would not be

3    enough to convict Johnson on this theory, the District Court cautioned, if

4    Johnson's misrepresentations merely induced Cairn to enter the bargain with

5    HSBC.

6           The jury convicted Johnson of conspiracy to commit wire fraud and all but

7    one of the wire fraud counts without specifying which theory of liability it relied

8    upon.[4]  The District Court sentenced Johnson principally to twenty-four months

9    of imprisonment.

10          This appeal followed.[5]

11                                    DISCUSSION

12          Johnson challenges the sufficiency of the evidence supporting his wire

13    fraud convictions under either theory of liability.  He also claims that applying

---

[4] The Government also dismissed another of the wire fraud counts before trial.
[5] This Court granted Johnson's motion for bail pending appeal.

12

**Attachment-12**

1    the federal wire fraud statute, § 1343, to the facts of this case violated his right to

2    due process.  We address each challenge in turn.

3        1.  <u>Sufficiency of the Evidence</u>

4        By raising a sufficiency challenge, Johnson "bears a heavy burden, [for] we

5    view the evidence in the light most favorable to the government, drawing all

6    inferences in the government's favor and deferring to the jury's assessments of

7    the witnesses' credibility."  <u>Caltabiano</u>, 871 F.3d at 218 (quotation marks

8    omitted).  "We will overturn the jury's verdict only if 'no rational trier of fact

9    could have found the essential elements of the crime beyond a reasonable

10   doubt.'"  <u>Id.</u> (quoting <u>United States v. Hussain</u>, 835 F.3d 307, 312 (2d Cir. 2016)).

11       "[W]hen two theories of an offense are submitted to the jury and the

12   evidence supports one theory but not the other," the verdict should be affirmed.

13   <u>United States v. Rutkoske</u>, 506 F.3d 170, 176 (2d Cir. 2007).  Here, we conclude

14   that the evidence was sufficient to convict Johnson of wire fraud and conspiracy

15   to commit wire fraud for depriving Cairn of the "right to control" its assets.

16   Accordingly, we need not and do not consider Johnson's arguments with respect

17   to the misappropriation theory.

**Attachment-13**

1        To prove a violation of the federal wire fraud statute, the Government had

2    to establish that Johnson (1) had an intent to defraud, (2) engaged in a fraudulent

3    scheme to obtain Cairn's money or property "involving material

4    misrepresentations—that is, misrepresentations that would naturally tend to

5    influence, or are capable of influencing," Cairn's decisionmaking, and (3) used

6    the wires to further that scheme.  Caltabiano, 871 F.3d at 218 (involving the mail

7    fraud statute); see United States v. Binday, 804 F.3d 558, 569 (2d Cir. 2015);

8    United States v. McGinn, 787 F.3d 116, 122 (2d Cir. 2015).  "[W]e have recognized

9    that the property interests protected by the . . . wire fraud[ ] statute[ ] include the

10    interest of a victim in controlling his or her own assets."  Binday, 804 F.3d at 570

11    (quotation marks omitted).  In right-to-control cases we determine if sufficient

12    proof of fraudulent intent exists by considering whether the defendant's

13    deception "affect[ed] the very nature of the bargain" between the defendant and

14    the victim.  United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987); see Binday, 804

15    F.3d at 569–70, 575 (looking to whether the deception went to "an essential

16    element of the bargain" to determine whether the defendant "contemplated

17    harm" cognizable under the statute (quotation marks omitted)).

14

**Attachment-14**

1        With that background, we consider whether there was sufficient evidence

2  that Johnson intended to deprive Cairn of information "that could impact . . .

3  [Cairn's] economic decisions," <u>United States v. Finazzo</u>, 850 F.3d 94, 108 (2d Cir.

4  2017) (quotation marks omitted), by, for example, influencing Cairn's "economic

5  calculus or the benefits and burdens of the agreement," <u>Binday</u>, 804 F.3d at 570,

6  or preventing Cairn from "negotiat[ing] a better deal for itself," <u>United States v.</u>

7  <u>Mittelstaedt</u>, 31 F.3d 1208, 1217 (2d Cir. 1994).  We remain mindful of the "fine

8  line between schemes that do no more than cause their victims to enter into

9  transactions they would otherwise avoid"—which do not violate the wire fraud

10  statute—and those schemes that "depend for their completion on a

11  misrepresentation of an essential element of the bargain."  <u>United States v.</u>

12  <u>Shellef</u>, 507 F.3d 82, 108 (2d Cir. 2007).

13        A. <u>Intent to Defraud</u>

14        Johnson's principal challenge to the sufficiency of the evidence against him

15  under the right-to-control theory relates to his intent to defraud Cairn.  Pointing

16  out that the Mandate Letter required that HSBC perform the transaction "at

17  Cairn's request, for an amount of up to USD4bn" at a rate "equivalent to [a] . . .

18  publicly available fixing[]," App'x 309, Johnson asserts that HSBC fulfilled its

1    obligation to Cairn by delivering 2.25 billion pounds to Cairn based on the 3 p.m.

2    fix rate and that the Mandate Letter, by its plain terms, neither restricted how

3    HSBC could acquire the pounds nor limited HSBC's profits.  Johnson therefore

4    claims that Cairn received "the full economic benefit of its bargain" under the

5    parties' Mandate Letter.  Appellant's Br. 43 (quotation marks omitted).  Relying

6    in part on our decision in Binday, Johnson urges that he cannot be criminally

7    liable for wire fraud in the absence of a contractual breach.

8        We disagree.  Section 1343 applies even if the parties' contract was never

9    breached.  Indeed, in Binday, we concluded that even though the victim received

10   the benefit of its bargain under the terms of the parties' contract, there was proof

11   of fraudulent intent because the defendants' misrepresentations implicated an

12   essential element of the bargain.  Binday, 804 F.3d at 565–67, 575–76.  The

13   defendants in Binday were accused of fraudulently misrepresenting their intent

14   to immediately transfer to third-party investors certain life insurance policies

15   that they had induced insurers to issue, even though the defendants knew that

16   the insurers had banned their brokers from authorizing such transfers.  Id. at

17   565–67.  On appeal, the defendants challenged their mail and wire fraud

18   convictions by arguing that, regardless of the insurers' ban, the policies

1    themselves permitted the defendants to sell them to third parties.  Id. at 575.  We

2    rejected the argument, finding sufficient evidence of an intent to harm because

3    the defendants' misrepresentations concerned a central part of the bargain:

4    whether the policies would certainly be sold and whether and at what price the

5    insurers would issue them.  Id. at 569–71, 575–76.  As we have explained,

6    fraudulent intent may be "apparent" where "the false representations are

7    directed to the quality, adequacy or price of the goods themselves . . . because the

8    victim is made to bargain without facts obviously essential in deciding whether

9    to enter the bargain."  United States v. Regent Office Supply Co., 421 F.2d 1174,

10   1182 (2d Cir. 1970); see also Starr, 816 F.2d at 98–100.

11         Similarly here, Johnson represented to Cairn that the price of the FX

12   Transaction would be determined under particular conditions.  Most

13   importantly, Johnson assured Cairn, HSBC would purchase pounds "quietly"

14   without ramping the 3 p.m. fix rate.  App'x 387.  Johnson thus suggested that

15   HSBC would seek a profit of just "a few pips for [its] account."  App'x 390.

16   Instead, Johnson directed Cahill, his trader, to ramp the fix rate to just under

17   1.5730, 100 pips above where the GBP/USD rate had started.  Johnson therefore

18   deceived Cairn with respect to both how the FX Transaction would be conducted

17

**Attachment-17**

1    and the price of the FX Transaction.  See Binday, 804 F.3d at 571 (noting that

2    "[t]he requisite harm is also shown where defendants' misrepresentations

3    pertained to the quality of services bargained for").  For this reason, we conclude

4    that Johnson's misrepresentations provided sufficient evidence for a reasonable

5    jury to find beyond a reasonable doubt that he intended to defraud Cairn.

6                    B.  Material Misrepresentations

7            Johnson next argues that there was insufficient evidence that any of his

8    misrepresentations were material.  A misrepresentation is material if it is capable

9    "of influencing the intended victim."  Neder v. United States, 527 U.S. 1, 24

10   (1999).  The requirement of materiality thus differs from the requirement of

11   fraudulent intent, which is that the misrepresentation must be "capable of

12   resulting in 'tangible harm.'"  Finazzo, 850 F.3d at 109 n.16 (quoting Mittelstaedt,

13   31 F.3d at 1217).  We drew this subtle line in Finazzo, for example, where we

14   explained that the question of harm in right-to-control cases is "a question of

15   fraudulent intent, requiring that defendants contemplated some actual,

16   cognizable harm or injury to their victims" by deceiving them.  Id. at 107 n.15.

17   By contrast, we noted, a false statement is material "if it has a natural tendency to

18   influence, or is capable of influencing, the decision of the decisionmaking body

18

**Attachment-18**

1    to which it was addressed." Id. (quoting United States v. Corsey, 723 F.3d 366,

2    373 (2d Cir. 2013)).

3          In our view, there was sufficient evidence that Johnson made at least two

4    material misrepresentations capable of influencing Cairn's decisions.  First,

5    during his October 2011 phone call with Jarrosson, Johnson represented that

6    HSBC would not "ramp the fix."  App'x 389.  A reasonable jury could point to

7    the evidence of Johnson's subsequent efforts to conceal HSBC's role in ramping

8    the fix for HSBC's benefit and to Cairn's detriment as proof that Johnson knew

9    that this statement was false.  Johnson argues that his statement to Jarrosson was

10   not a lie because he informed Jarrosson that HSBC would buy pounds before the

11   fix was set.  We agree, based on the trial evidence, that Johnson disclosed HSBC's

12   intent to trade ahead of the fix.  But in doing so Johnson also misrepresented the

13   method by which HSBC would trade ahead.  As noted, he confirmed that HSBC

14   would "quietly" accumulate its position in pounds and suggested that HSBC

15   would not "ramp the fix," knowing how important each of these representations

16   about process was to Cairn.  App'x 386, 389.  Contrary to these representations,

17   however, Johnson directed Cahill to ramp the fix to a rate just below 1.5730.

19

**Attachment-19**

1    There was ample evidence for a reasonable jury to find that Johnson's

2    misrepresentations not only could, but in fact did, influence Cairn's decision as

3    to the type of transaction to undertake.  After his phone call with Johnson,

4    Jarrosson recommended that Cairn engage HSBC to do a Fixing Transaction;

5    HSBC and Cairn signed the Mandate Letter, which described a Fixing

6    Transaction as one of two alternative methods (the other being a Full-Risk

7    Transfer); and Cairn ultimately selected a Fixing Transaction.

8    Johnson contends that none of his misrepresentations were material

9    because the cost to Cairn would have been even greater had it elected to proceed

10   with a Full-Risk Transfer rather than a Fixing Transaction.  We reject that

11   argument because it rests on a misunderstanding of the question before us.  As

12   we have explained, the "question of whether a defendant's misrepresentation

13   was capable of influencing a decisionmaker" in a right-to-control case "should

14   not be conflated with [the] requirement that that misrepresentation be capable of

15   resulting in tangible harm."  Finazzo, 850 F.3d at 109 n.16 (quotation marks

16   omitted).  So "[i]t is . . . possible for a misrepresentation to influence

17   decisionmaking in a manner that nevertheless does not produce tangible harm."

18   Id.; see also Neder, 527 U.S. at 16, 24.

1    Johnson's second material misrepresentation occurred on December 7 after

2    the 3 p.m. fix, during a debriefing call between HSBC, Cairn, and Rothschild.  In

3    explaining why the market had moved so dramatically during the hour before

4    the fix, Johnson's colleague, Scott, suggested that the Russian Central Bank was

5    responsible.  Johnson confirmed that the Russian Central Bank was "always

6    selling dollars."  App'x 340.  The next day, Johnson acknowledged that he knew

7    the Russian Central Bank story was untrue:  He recounted that when Cairn asked

8    why the fix rate had jumped, "we said the usual, Russian names, other central

9    banks, all that sort of stuff."  Gov't App'x 137.

10   On appeal, Johnson asserts that his statement about the Russian Central

11   Bank was not material because it was made after the FX Transaction, and the

12   Mandate Letter prevented Cairn from walking away from the transaction after it

13   was done.  But Cairn was not stuck with the FX Transaction once it was

14   completed.  It could have, among other things, sought immediate legal action on

15   the ground that it had been defrauded.  We think that a reasonable jury therefore

16   could have viewed Johnson's post-transaction misrepresentations as influencing

17   Cairn's decision not to pursue various courses of action immediately after the

18   fact.

21

**Attachment-21**

1        2.  Due Process

2        The Due Process Clause of the Fifth Amendment provides that "[n]o

3    person shall . . . be deprived of life, liberty, or property, without due process of

4    law."  U.S. CONST. amend. V.  "[T]he Government violates this guarantee by

5    taking away someone's life, liberty, or property under a criminal law so vague

6    that it fails to give ordinary people fair notice of the conduct it punishes, or so

7    standardless that it invites arbitrary enforcement."  Johnson v. United States, 135

8    S. Ct. 2551, 2556 (2015) (citing Kolender v. Lawson, 461 U.S. 352, 357–58 (1983)).

9        Johnson argues that his convictions violated his Fifth Amendment right to

10   due process for two reasons.  First, he claims that he lacked fair warning that his

11   actions were illegal, especially since there was (and, according to Johnson,

12   apparently still is) no rule prohibiting trading ahead of a fix.  Second and

13   relatedly, he points out that the Government "is unable to explain when a fix

14   transaction becomes criminal wire fraud," rendering it a standardless crime.

15   Appellant's Br. 52.  Neither argument has merit.

16       As for the first argument, Johnson claims that trading ahead of the fix, or

17   so-called "frontrunning," is perfectly legal in the foreign exchange market.

18   Indeed, he points out, in 2011 banks routinely executed fixing transactions by

22

**Attachment-22**

1    trading ahead of the fix.  But Johnson was not convicted of frontrunning.  He was

2    convicted of making material misrepresentations to Cairn about <u>how</u> HSBC

3    would trade ahead of the fix and the price would be determined.  As we

4    explained above, a reasonable jury could have found that these

5    misrepresentations affected Cairn's decisionmaking and deprived it of the right

6    to control its assets.  So we need not express an opinion on the law relating to

7    frontrunning in 2011.

8         We reject Johnson's second argument for similar reasons.  Johnson

9    describes his conviction as "unconstitutionally standardless" because, he says,

10   the Government is unable to explain when a fixing transaction becomes criminal.

11   Appellant's Br. 52.  But the standard is clear:  A defendant who executes a fixing

12   transaction engages in criminal fraud if he intentionally misrepresents to the

13   victim how he will trade ahead of the fix, thereby deceiving the victim as to how

14   the price of the transaction will be determined.

15        For these reasons, we reject Johnson's challenge to his convictions based on

16   the Due Process Clause.

17

18

**Attachment-23**

1                              CONCLUSION

2          We have considered Johnson's remaining arguments and conclude that

3   they are without merit or need not be addressed.  See Rutkoske, 506 F.3d at 176.

4   For the foregoing reasons, the judgment of conviction is **AFFIRMED**.

24

**Attachment-24**

18-1503-cr
United States v. Johnson

1   **UNITED STATES COURT OF APPEALS**
2   **FOR THE SECOND CIRCUIT**
3
4   August Term, 2018
5
6   (Argued: May 31, 2019         Decided: September 12, 2019)
7
8   Docket No. 18-1503-cr
9
10  _____
11
12  UNITED STATES OF AMERICA,
13
14  *Appellee,*
15
16  v.
17
18  MARK JOHNSON,
19
20  *Defendant-Appellant.*[*]
21
22  _____
23
24  Before:
25
26  CALABRESI and LOHIER, *Circuit Judges*, and DONNELLY, *District Judge*.[**]
27
28     Mark Johnson, the former global head of the foreign exchange trading
29  desk at the investment bank HSBC, was convicted by a jury of wire fraud and
30  conspiracy to commit wire fraud in connection with a foreign currency exchange
31  transaction with Cairn Energy.  At trial, the Government argued, among other
32  things, that Johnson denied Cairn the right to control its assets by depriving it of
33  information necessary to make its own discretionary economic decisions.

---

[*] The Clerk of Court is directed to amend the official caption to conform with the above.
[**] Judge Ann M. Donnelly, of the United States District Court for the Eastern District of
New York, sitting by designation.

1   Johnson argues that there was insufficient evidence for a reasonable jury to
2   convict him under a right-to-control theory because Cairn received the benefit of
3   its bargain in the transaction and any misrepresentations Johnson may have
4   made were immaterial.  We conclude that there was sufficient evidence to
5   convict Johnson on the right-to-control theory because a reasonable jury could
6   conclude that his misrepresentations to Cairn related to the price of the
7   transaction and were capable of influencing Cairn's decisionmaking.
8   **AFFIRMED.**
9
10                          LAUREN HOWARD ELBERT, Assistant United States
11                          Attorney (David C. James, Assistant United States
12                          Attorney, Carol Sipperly, Brian Young, Assistant Chiefs,
13                          Blake Goebel, Trial Attorney, United States Department
14                          of Justice, *on the brief*), *for* Richard P. Donoghue, United
15                          States Attorney, Eastern District of New York,
16                          Brooklyn, NY, *for Appellee* United States of America.
17
18                          ALEXANDRA A.E. SHAPIRO, Shapiro Arato LLP, New
19                          York, NY (Eric S. Olney, Jacob S. Wolfe, Shapiro Arato
20                          LLP, New York, NY, Frank H. Wohl, John R. Wing,
21                          Lankler Siffert & Wohl LLP, New York, NY, *on the brief*),
22                          *for Defendant-Appellant* Mark Johnson.

23   LOHIER, *Circuit Judge*:

24          Mark Johnson, the former global head of the foreign exchange trading

25   desk at the investment bank HSBC, was convicted by a jury of wire fraud and

26   conspiracy to commit wire fraud in connection with a foreign currency exchange

27   transaction with Cairn Energy.  At trial and on appeal, the Government argued

28   that Johnson could be convicted on either of two theories of criminal liability:

29   (1) misappropriation of the confidential information of Cairn in breach of a duty

2

**Attachment-26**

1    of trust and confidence owed to Cairn; or (2) denial of Cairn's right to control its

2    assets by depriving it of information necessary to make discretionary economic

3    decisions.  In response, Johnson argues that there was insufficient evidence for a

4    jury to convict him under the misappropriation theory and also insufficient

5    evidence to convict him under a right-to-control theory because Cairn received

6    the benefit of its bargain and any misrepresentations that Johnson may have

7    made were immaterial.  We conclude that there was sufficient evidence to

8    convict Johnson on the right-to-control theory because a reasonable jury could

9    conclude that his misrepresentations to Cairn related to the price of the

10   transaction, which was an essential element of the parties' bargain, and were

11   capable of influencing Cairn's decisionmaking.  Accordingly, we need not reach

12   Johnson's arguments as to the misappropriation theory, and Johnson's conviction

13   is **AFFIRMED.**

14                                   B<small>ACKGROUND</small>

15        1.  <u>Facts</u>

16        Because this is an appeal from a judgment of conviction entered after a

17   jury trial and Johnson challenges the sufficiency of the evidence against him, the

18   following facts are drawn from the trial evidence and described "in the light

1    most favorable to the Government." United States v. Caltabiano, 871 F.3d 210,

2    213 (2d Cir. 2017).

3         A. Cairn Energy Selects HSBC to Perform a Large FX Transaction

4         Cairn, whose stock trades on the London Stock exchange, is one of

5    Europe's leading oil and gas firms.  In August 2010 Cairn announced a plan to

6    sell a majority interest in one of its subsidiaries and to distribute a substantial

7    amount of the sales proceeds to its shareholders.  Before Cairn could distribute

8    the proceeds, however, it had to first convert the U.S. dollars (USD) it received

9    from the sale into British pounds (GBP).  Cairn retained Rothschild & Co., an

10   investment bank, to advise it on conducting a significant foreign currency

11   exchange transaction of up to four billion dollars for pounds (the FX

12   Transaction).  Such a transaction involves trading one currency for another at the

13   exchange rate for the underlying currencies, whose values are governed by the

14   laws of supply and demand.  Movements in exchange rates are measured in

15   "pips," and 100 pips is equivalent to one penny.

16        In 2011 Cairn sent Requests for Proposals (RFPs) to nine major banks to

17   execute the FX Transaction.  HSBC responded to the RFP by recommending that

18   Cairn employ a method of currency exchange known as a Fixing Transaction.

4

**Attachment-28**

1    HSBC explained that a Fixing Transaction involved exchanging GBP for USD at

2    either a daily exchange rate that the European Central Bank published, or at an

3    hourly exchange rate that the company WM/Reuters published.  The parties

4    eventually agreed to use the hourly exchange rate published by WM/Reuters.[1]

5    To effectuate the transaction and to give HSBC time to buy the pounds to sell to

6    Cairn, HSBC requested that Cairn provide HSBC two hours' advance notice of

7    the hourly exchange rate, or fix, at which Cairn wanted to trade.  HSBC warned

8    that a Fixing Transaction involved some risk because Cairn would be exposed to

9    exchange rate fluctuations in the hours prior to the fix.  But HSBC also reassured

10   Cairn that it could "seamlessly execute a transaction of this magnitude without

11   creating excessive market volatility."  App'x 274.  HSBC further explained that a

12   Fixing Transaction provided transparency to Cairn's shareholders, who would

13   be able to see that Cairn paid no more than the published market rate.

14        About a week after HSBC's response to Cairn's RFP, Francois Jarrosson,

15   the Rothschild partner principally responsible for the Cairn engagement, spoke

16   with Johnson about a Fixing Transaction.  Johnson explained that having at least

---

[1] WM/Reuters calculated its hourly exchange rate by taking the "median average" of the price of trades published in a one-minute window, beginning 30 seconds before and finishing 30 seconds after the hour.  App'x 279.

1    two hours' notice before the designated fix would allow HSBC to "more

2    quietly . . . accumulate" pounds for Cairn.  App'x 386.  But if Cairn gave HSBC

3    only thirty minutes' notice, Johnson warned, HSBC would have "a lot to buy"

4    and would "cause a lot of noise" in the market.  App'x 387.  Johnson also said

5    that HSBC would aim "to make a small amount of money out of [the Fixing

6    Transaction] clearly because that's . . . our business," but that HSBC also wanted

7    "a happy customer" who would get "a fair price."  App'x 387.  Jarrosson worried

8    that HSBC might make more than "a small amount of money" if it was able to

9    purchase pounds at an exchange rate much lower than the hourly fix that Cairn

10   would eventually be obligated to pay.  In that case, Jarrosson asked, would

11   HSBC be open to sharing "some [of the] upside" with Cairn?  App'x 389.

12   Johnson demurred, and answered that a bank that offered a discount on the fix

13   rate really intended to trade currency before the fix in such a way as to artificially

14   increase, or "ramp," the currency's price at the fix.  After ramping the fix,

15   Johnson added, such a bank would sell the currency to its counterparty at the

16   inflated fix, making up for any loss on the negotiated discount.  Johnson said that

17   he was "horrified" when he saw banks offering "the fix minus one pip" (in other

18   words, the exchange rate at the fix minus one hundredth of a cent), because those

6

**Attachment-30**

1    banks clearly intended to "ramp the fix" at the expense of the counterparty.

2    App'x 389–90.

3          Following his call with Johnson, Jarrosson recommended that Cairn

4    engage HSBC and use a Fixing Transaction to complete the currency exchange.

5          B.  The Mandate Letter

6          In late October 2011 Cairn and HSBC signed a "Mandate Letter" that

7    formally awarded Cairn's FX engagement to HSBC.  The Mandate Letter

8    committed HSBC to execute an FX Transaction at Cairn's request for an amount

9    up to $4 billion USD.  The Letter also gave Cairn the option of performing the

10   trade through a Fixing Transaction or a Full-Risk Transfer.  If Cairn chose a

11   Fixing Transaction, HSBC would be obligated to perform the transaction at a

12   price equivalent to a publicly available fix rate, provided that Cairn gave HSBC

13   around two hours' notice prior to the particular hourly fix that Cairn wanted to

14   use.  If Cairn chose a Full-Risk Transfer, HSBC would be obligated to perform the

15   transaction at the prevailing market rate at the time of Cairn's call plus, at most, a

16   100-pip charge.  The additional charge for the Full-Risk Transfer protected HSBC

17   against the currency risk it assumed by first guaranteeing Cairn a particular

18   GBP/USD exchange rate and only thereafter purchasing pounds to sell to Cairn.

7

**Attachment-31**

1       C. <u>The FX Transaction</u>

2       On December 7, 2011, Cairn instructed HSBC that it wanted to buy 2.25

3   billion pounds for dollars using a Fixing Transaction at the day's 3 p.m. fix.

4   HSBC trader Frank Cahill had the job of executing Cairn's order.  Once Johnson

5   learned that the Fixing Transaction would happen that afternoon, however, he

6   began to tip off HSBC traders in New York and London to buy pounds.

7   Meanwhile, Cahill, unaware of the promise not to "ramp up" the price of

8   pounds, executed the Cairn transaction the way he had traded fixing transactions

9   "[a]lmost every day of [his] career."  App'x 150, 172.  To ensure a profit for

10  HSBC, Cahill bought pounds in a manner designed to increase their price, in part

11  by using "aggressive" buying techniques like "bidding through the market"

12  (which means putting in an offer to buy at a higher price than sellers' stated

13  prices).  App'x 154–55.  But a bank's buying spree tends to drive up the price of

14  the commodity that the bank is buying.  Had HSBC wanted to acquire pounds in

15  a way that kept their price "as low as possible," Cahill confirmed, he would have

16  tried to mask HSBC's buying spree by trading less aggressively.  App'x 155.

17      At 2:54 p.m. that day, Johnson called his colleague Stuart Scott, who was

18  with Cahill in London, to discuss what Cahill should do in the last few minutes

**Attachment-32**

1    before the 3 p.m. fix.  Johnson advised Scott that Cahill should not "ramp" the fix

2    above a 1.5730 GBP/USD exchange rate because Cairn "[couldn't] really

3    complain" so long as the 3 p.m. fix stayed below that rate.  App'x 335.  But if the

4    rate rose above 1.5730, Johnson said, Cairn would "squeal."  Id.  Johnson later

5    told a colleague that his team had to "make sure the fix [was] below [1.5730] or

6    [Cairn was] going to be sure [it had] been ripped off."  Gov't App'x 137.  Johnson

7    apparently believed that Cairn would not complain if the fix rate stayed below

8    1.5730 because 1.5730 was 100 pips above 1.5630, the prevailing rate at the time

9    that Cairn placed its order with HSBC.  As Johnson surely knew, had Cairn

10   chosen instead to proceed with a Full-Risk Transfer, Cairn would have bought

11   the 2.25 billion pounds at an exchange rate of 1.5630 plus a 100-pip charge, for

12   precisely the same final rate of 1.5730.  Therefore, Johnson calculated, so long as

13   the final cost of the Fixing Transaction that Cairn requested stayed below what

14   the cost of a Full-Risk Transfer—even with its extra charge—would have been,

15   Cairn had nothing to complain about.

16        D. Outcomes for Cairn and HSBC

17        The published 3 p.m. fix on December 7, 2011 was 1.57185.  In a debriefing

18   conference call later that day, Cairn's treasurer expressed concern over the

9

**Attachment-33**

1  increase in the GBP/USD exchange rate during the hour before 3 p.m.  In

2  explaining why the market had moved so much during that hour, Johnson's

3  colleague, Scott, suggested that the Russian Central Bank was responsible.

4  Johnson then corroborated Scott's statement, saying that the Russian Central

5  Bank was "always selling dollars."  App'x 340.  Although Johnson added that he

6  felt "comfortable" with the 3 p.m. rate because Cairn would have ended up with

7  a higher rate had it chosen a Full-Risk Transfer, App'x 339, he offered to return

8  2.5 pips to Cairn, for a final exchange rate of 1.57160.  The next day after the

9  conference call, Johnson appeared to confirm that he knew the Russian Central

10  Bank story was a lie, recounting to a colleague that when Cairn asked why the fix

11  rate had jumped, "we said the usual, Russian names, other central banks, all that

12  sort of stuff."  Gov't App'x 137.

13      HSBC ultimately profited about $7 million on the transaction with Cairn.

14      2.  Procedural History

15      Johnson was indicted on one count of conspiracy to commit wire fraud, see

16  18 U.S.C. § 1349, and ten counts of wire fraud, see 18 U.S.C. § 1343.[2]  At trial, the

17  Government's primary theory of liability under the wire fraud statute was that

---

[2] Johnson's colleague, Scott, was also indicted but is still in the United Kingdom and has
contested extradition.

**Attachment-34**

1    Johnson misappropriated Cairn's confidential information, in breach of a duty of

2    trust and confidence owed to Cairn, by driving up the fix rate in order to

3    generate secret profits for HSBC (the "misappropriation theory"). The jury was

4    accordingly instructed that in order to convict Johnson under that theory,

5    Johnson and Cairn must have entered into a relationship of "reliance and de

6    facto control and dominance." Gov't App'x 103.

7         The Government also offered an alternative theory of liability. Referring

8    to the central bargain between Cairn and HSBC, the Government told the jury

9    that Johnson had denied Cairn the right to control its assets by depriving it of

10   information necessary to allow it to make discretionary economic decisions (the

11   "right-to-control theory"). Further to this theory, the District Court instructed

12   the jury that Johnson must have made "misrepresentations or non-disclosures"

13   to Cairn that went "to the heart of Cairn's bargain with HSBC" and could or did

14   "result in tangible economic harm to Cairn." Gov't App'x 105. It would not be

15   enough to convict Johnson on this theory, the District Court cautioned, if

16   Johnson's misrepresentations merely induced Cairn to enter the bargain with

17   HSBC.

**Attachment-35**

1    The jury convicted Johnson of conspiracy to commit wire fraud and all but

2    one of the wire fraud counts without specifying which theory of liability it relied

3    upon.[3]  The District Court sentenced Johnson principally to twenty-four months

4    of imprisonment.

5         This appeal followed.[4]

6                          DISCUSSION

7         Johnson challenges the sufficiency of the evidence supporting his wire

8    fraud convictions under either theory of liability.  He also claims that applying

9    the federal wire fraud statute, § 1343, to the facts of this case violated his right to

10   due process.  We address each challenge in turn.

11   1.  Sufficiency of the Evidence

12        By raising a sufficiency challenge, Johnson "bears a heavy burden, [for] we

13   view the evidence in the light most favorable to the government, drawing all

14   inferences in the government's favor and deferring to the jury's assessments of

15   the witnesses' credibility."  Caltabiano, 871 F.3d at 218 (quotation marks

16   omitted).  "We will overturn the jury's verdict only if 'no rational trier of fact

---

[3] The Government also dismissed another of the wire fraud counts before trial.
[4] This Court granted Johnson's motion for bail pending appeal.

12

**Attachment-36**

1  could have found the essential elements of the crime beyond a reasonable

2  doubt.'"  Id. (quoting United States v. Hussain, 835 F.3d 307, 312 (2d Cir. 2016)).

3      "[W]hen two theories of an offense are submitted to the jury and the

4  evidence supports one theory but not the other," the verdict should be affirmed.

5  United States v. Rutkoske, 506 F.3d 170, 176 (2d Cir. 2007).  Here, we conclude

6  that the evidence was sufficient to convict Johnson of wire fraud and conspiracy

7  to commit wire fraud for depriving Cairn of the "right to control" its assets.

8  Accordingly, we need not and do not consider Johnson's arguments with respect

9  to the misappropriation theory.

10      To prove a violation of the federal wire fraud statute, the Government had

11  to establish that Johnson (1) had an intent to defraud, (2) engaged in a fraudulent

12  scheme to obtain Cairn's money or property "involving material

13  misrepresentations—that is, misrepresentations that would naturally tend to

14  influence, or are capable of influencing," Cairn's decisionmaking, and (3) used

15  the wires to further that scheme.  Caltabiano, 871 F.3d at 218 (involving the mail

16  fraud statute); see United States v. Binday, 804 F.3d 558, 569 (2d Cir. 2015);

17  United States v. McGinn, 787 F.3d 116, 122 (2d Cir. 2015).  "[W]e have recognized

18  that the property interests protected by the . . . wire fraud[ ] statute[ ] include the

**Attachment-37**

1    interest of a victim in controlling his or her own assets." Binday, 804 F.3d at 570

2    (quotation marks omitted).  In right-to-control cases we determine if sufficient

3    proof of fraudulent intent exists by considering whether the defendant's

4    deception "affect[ed] the very nature of the bargain" between the defendant and

5    the victim. United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987); see Binday, 804

6    F.3d at 569–70, 575 (looking to whether the deception went to "an essential

7    element of the bargain" to determine whether the defendant "contemplated

8    harm" cognizable under the statute (quotation marks omitted)).

9        With that background, we consider whether there was sufficient evidence

10   that Johnson intended to deprive Cairn of information "that could impact . . .

11   [Cairn's] economic decisions," United States v. Finazzo, 850 F.3d 94, 108 (2d Cir.

12   2017) (quotation marks omitted), by, for example, influencing Cairn's "economic

13   calculus or the benefits and burdens of the agreement," Binday, 804 F.3d at 570,

14   or preventing Cairn from "negotiat[ing] a better deal for itself," United States v.

15   Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir. 1994).  We remain mindful of the "fine

16   line between schemes that do no more than cause their victims to enter into

17   transactions they would otherwise avoid"—which do not violate the wire fraud

18   statute—and those schemes that "depend for their completion on a

14

**Attachment-38**

1  misrepresentation of an essential element of the bargain." <u>United States v.</u>

2  <u>Shellef</u>, 507 F.3d 82, 108 (2d Cir. 2007).

3           A. <u>Intent to Defraud</u>

4           Johnson's principal challenge to the sufficiency of the evidence against him

5  under the right-to-control theory relates to his intent to defraud Cairn.  Pointing

6  out that the Mandate Letter required that HSBC perform the transaction "at

7  Cairn's request, for an amount of up to USD4bn" at a rate "equivalent to [a] . . .

8  publicly available fixing[]," App'x 309, Johnson asserts that HSBC fulfilled its

9  obligation to Cairn by delivering 2.25 billion pounds to Cairn based on the 3 p.m.

10  fix rate and that the Mandate Letter, by its plain terms, neither restricted how

11  HSBC could acquire the pounds nor limited HSBC's profits.  Johnson therefore

12  claims that Cairn received "the full economic benefit of its bargain" under the

13  parties' Mandate Letter.  Appellant's Br. 43 (quotation marks omitted).  Relying

14  in part on our decision in <u>Binday</u>, Johnson urges that he cannot be criminally

15  liable for wire fraud in the absence of a contractual breach.

16           We disagree.  Section 1343 applies even if the parties' contract was never

17  breached.  Indeed, in <u>Binday</u>, we concluded that even though the victim received

18  the benefit of its bargain under the terms of the parties' contract, there was proof

15

**Attachment-39**

1    of fraudulent intent because the defendants' misrepresentations implicated an

2    essential element of the bargain.  <u>Binday</u>, 804 F.3d at 565–67, 575–76.  The

3    defendants in <u>Binday</u> were accused of fraudulently misrepresenting their intent

4    to immediately transfer to third-party investors certain life insurance policies

5    that they had induced insurers to issue, even though the defendants knew that

6    the insurers had banned their brokers from authorizing such transfers.  <u>Id.</u> at

7    565–67.  On appeal, the defendants challenged their mail and wire fraud

8    convictions by arguing that, regardless of the insurers' ban, the policies

9    themselves permitted the defendants to sell them to third parties.  <u>Id.</u> at 575.  We

10   rejected the argument, finding sufficient evidence of an intent to harm because

11   the defendants' misrepresentations concerned a central part of the bargain:

12   whether the policies would certainly be sold and whether and at what price the

13   insurers would issue them.  <u>Id.</u> at 569–71, 575–76.  As we have explained,

14   fraudulent intent may be "apparent" where "the false representations are

15   directed to the quality, adequacy or price of the goods themselves . . . because the

16   victim is made to bargain without facts obviously essential in deciding whether

17   to enter the bargain."  <u>United States v. Regent Office Supply Co.</u>, 421 F.2d 1174,

18   1182 (2d Cir. 1970); <u>see also</u> <u>Starr</u>, 816 F.2d at 98–100.

16

**Attachment-40**

1        Similarly here, Johnson represented to Cairn that the price of the FX

2    Transaction would be determined under particular conditions.  Most

3    importantly, Johnson assured Cairn, HSBC would purchase pounds "quietly"

4    without ramping the 3 p.m. fix rate.  App'x 387.  Johnson thus suggested that

5    HSBC would seek a profit of just "a few pips for [its] account."  App'x 390.

6    Instead, Johnson directed Cahill, his trader, to ramp the fix rate to just under

7    1.5730, 100 pips above where the GBP/USD rate had started.  Johnson therefore

8    deceived Cairn with respect to both how the FX Transaction would be conducted

9    and the price of the FX Transaction.  See Binday, 804 F.3d at 571 (noting that

10   "[t]he requisite harm is also shown where defendants' misrepresentations

11   pertained to the quality of services bargained for").  For this reason, we conclude

12   that Johnson's misrepresentations provided sufficient evidence for a reasonable

13   jury to find beyond a reasonable doubt that he intended to defraud Cairn.

14                    B.  Material Misrepresentations

15       Johnson next argues that there was insufficient evidence that any of his

16   misrepresentations were material.  A misrepresentation is material if it is capable

17   "of influencing the intended victim."  Neder v. United States, 527 U.S. 1, 24

18   (1999).  The requirement of materiality thus differs from the requirement of

**Attachment-41**

1    fraudulent intent, which is that the misrepresentation must be "capable of

2    resulting in 'tangible harm.'" <u>Finazzo</u>, 850 F.3d at 109 n.16 (quoting <u>Mittelstaedt</u>,

3    31 F.3d at 1217).  We drew this subtle line in <u>Finazzo</u>, for example, where we

4    explained that the question of harm in right-to-control cases is "a question of

5    fraudulent intent, requiring that defendants contemplated some actual,

6    cognizable harm or injury to their victims" by deceiving them.  <u>Id.</u> at 107 n.15.

7    By contrast, we noted, a false statement is material "if it has a natural tendency to

8    influence, or is capable of influencing, the decision of the decisionmaking body

9    to which it was addressed."  <u>Id.</u> (quoting <u>United States v. Corsey</u>, 723 F.3d 366,

10   373 (2d Cir. 2013)).

11        In our view, there was sufficient evidence that Johnson made at least two

12   material misrepresentations capable of influencing Cairn's decisions.  First,

13   during his October 2011 phone call with Jarrosson, Johnson represented that

14   HSBC would not "ramp the fix."  App'x 389.  A reasonable jury could point to

15   the evidence of Johnson's subsequent efforts to conceal HSBC's role in ramping

16   the fix for HSBC's benefit and to Cairn's detriment as proof that Johnson knew

17   that this statement was false.  Johnson argues that his statement to Jarrosson was

18   not a lie because he informed Jarrosson that HSBC would buy pounds before the

18

**Attachment-42**

1    fix was set.  We agree, based on the trial evidence, that Johnson disclosed HSBC's

2    intent to trade ahead of the fix.  But in doing so Johnson also misrepresented the

3    method by which HSBC would trade ahead.  As noted, he confirmed that HSBC

4    would "quietly" accumulate its position in pounds and suggested that HSBC

5    would not "ramp the fix," knowing how important each of these representations

6    about process was to Cairn.  App'x 386, 389.  Contrary to these representations,

7    however, Johnson directed Cahill to ramp the fix to a rate just below 1.5730.

8           There was ample evidence for a reasonable jury to find that Johnson's

9    misrepresentations not only could, but in fact did, influence Cairn's decision as

10    to the type of transaction to undertake.  After his phone call with Johnson,

11    Jarrosson recommended that Cairn engage HSBC to do a Fixing Transaction;

12    HSBC and Cairn signed the Mandate Letter, which described a Fixing

13    Transaction as one of two alternative methods (the other being a Full-Risk

14    Transfer); and Cairn ultimately selected a Fixing Transaction.

15           Johnson contends that none of his misrepresentations were material

16    because the cost to Cairn would have been even greater had it elected to proceed

17    with a Full-Risk Transfer rather than a Fixing Transaction.  We reject that

18    argument because it rests on a misunderstanding of the question before us.  As

19

**Attachment-43**

1    we have explained, the "question of whether a defendant's misrepresentation

2    was capable of influencing a decisionmaker" in a right-to-control case "should

3    not be conflated with [the] requirement that that misrepresentation be capable of

4    resulting in tangible harm." Finazzo, 850 F.3d at 109 n.16 (quotation marks

5    omitted). So "[i]t is . . . possible for a misrepresentation to influence

6    decisionmaking in a manner that nevertheless does not produce tangible harm."

7    Id.; see also Neder, 527 U.S. at 16, 24.

8         Johnson's second material misrepresentation occurred on December 7 after

9    the 3 p.m. fix, during a debriefing call between HSBC, Cairn, and Rothschild.  In

10   explaining why the market had moved so dramatically during the hour before

11   the fix, Johnson's colleague, Scott, suggested that the Russian Central Bank was

12   responsible.  Johnson confirmed that the Russian Central Bank was "always

13   selling dollars."  App'x 340.  The next day, Johnson acknowledged that he knew

14   the Russian Central Bank story was untrue:  He recounted that when Cairn asked

15   why the fix rate had jumped, "we said the usual, Russian names, other central

16   banks, all that sort of stuff."  Gov't App'x 137.

17        On appeal, Johnson asserts that his statement about the Russian Central

18   Bank was not material because it was made after the FX Transaction, and the

**Attachment-44**

1    Mandate Letter prevented Cairn from walking away from the transaction after it

2    was done.  But Cairn was not stuck with the FX Transaction once it was

3    completed.  It could have sought to unwind the transaction before settlement,

4    withhold payment, or seek immediate legal action on the ground that it had been

5    defrauded.  We think that a reasonable jury therefore could have viewed

6    Johnson's post-transaction misrepresentations as influencing Cairn's decision not

7    to pursue these various courses of action immediately after the fact.

8        2.  <u>Due Process</u>

9        The Due Process Clause of the Fifth Amendment provides that "[n]o

10   person shall . . . be deprived of life, liberty, or property, without due process of

11   law."  U.S. CONST. amend. V.  "[T]he Government violates this guarantee by

12   taking away someone's life, liberty, or property under a criminal law so vague

13   that it fails to give ordinary people fair notice of the conduct it punishes, or so

14   standardless that it invites arbitrary enforcement."  <u>Johnson v. United States</u>, 135

15   S. Ct. 2551, 2556 (2015) (citing <u>Kolender v. Lawson</u>, 461 U.S. 352, 357–58 (1983)).

16       Johnson argues that his convictions violated his Fifth Amendment right to

17   due process for two reasons.  First, he claims that he lacked fair warning that his

18   actions were illegal, especially since there was (and, according to Johnson,

21

**Attachment-45**

1    apparently still is) no rule prohibiting trading ahead of a fix.  Second and

2    relatedly, he points out that the Government "is unable to explain when a fix

3    transaction becomes criminal wire fraud," rendering it a standardless crime.

4    Appellant's Br. 52.  Neither argument has merit.

5        As for the first argument, Johnson claims that trading ahead of the fix, or

6    so-called "frontrunning," is perfectly legal in the foreign exchange market.

7    Indeed, he points out, in 2011 banks routinely executed fixing transactions by

8    trading ahead of the fix.  But Johnson was not convicted of frontrunning.  He was

9    convicted of making material misrepresentations to Cairn about <u>how</u> HSBC

10   would trade ahead of the fix and the price would be determined.  As we

11   explained above, a reasonable jury could have found that these

12   misrepresentations affected Cairn's decisionmaking and deprived it of the right

13   to control its assets.  So we need not express an opinion on the law relating to

14   frontrunning in 2011.

15       We reject Johnson's second argument for similar reasons.  Johnson

16   describes his conviction as "unconstitutionally standardless" because, he says,

17   the Government is unable to explain when a fixing transaction becomes criminal.

18   Appellant's Br. 52.  But the standard is clear:  A defendant who executes a fixing

22

**Attachment-46**

1    transaction engages in criminal fraud if he intentionally misrepresents to the

2    victim how he will trade ahead of the fix, thereby deceiving the victim as to how

3    the price of the transaction will be determined.

4            For these reasons, we reject Johnson's challenge to his convictions based on

5    the Due Process Clause.

6                                    CONCLUSION

7            We have considered Johnson's remaining arguments and conclude that

8    they are without merit or need not be addressed.  See Rutkoske, 506 F.3d at 176.

9    For the foregoing reasons, the judgment of conviction is **AFFIRMED**.

23

**Attachment-47**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENT, AND <u>TYPE STYLE REQUIREMENT</u>

1.  The undersigned counsel of record for Defendant-Appellant Mark Johnson certifies pursuant to Federal Rules of Appellate Procedure 32(g) that this brief complies with the type-volume limitation of and 35(b)(2)(A) because it contains 3,899 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), according to the Word Count feature of Microsoft Word 2016.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font of Times New Roman.

Dated:    December 30, 2019

<u>/s/ Alexandra A.E. Shapiro</u>
Alexandra A.E. Shapiro
